GEORGE W. MARKHAM, Appellant, *v.* WILLIAM B. JAUDON and CHARLES B. JAUDON, Respondents.

Where the defendants, stockbrokers, at the request of the plaintiff, and for him, but in their own names and with their own funds, purchased certain stocks, he depositing with them a "margin" of ten per cent, which was to be "kept good," and they "carrying" the stocks for him.—*Held* (GROVER and WOODRUFF, JJ., *contra.*), that the legal relation created between the parties by this transaction was necessarily that of pledgor and pledgees, the stock purchased being the property of the plaintiff, and, in effect, pledged to the defendants as security for the repayment of the advances made by them in the purchase; and that a sale of such stock by them, except upon judicial proceedings, or after a demand upon him for the repayment of such advances and commissions, and a reasonable, personal notice to him of their intention to make such sale, in case of default in payment, specifying the time and place of sale, is a wrongful *conversion* by them of the property of the plaintiff.

*Held,* further, that in an action by the plaintiff against them for such conversion, evidence of a usage, that stocks so held might be sold without notice by the broker, whenever, by the fall of the stock in the market, the "margin" or ten per cent deposit was exhausted, was inadmissible, such usage being in direct variance with the settled rule of law applicable to the case.

*Held,* further, that the proper rule of damages in such an action, was the highest market price of the property between the time of the conversion and the trial. (GROVER and WOODRUFF, JJ., *contra.*)

(Cause argued June 21st, held over September Term, for further consideration, and decided December 23, 1869.)

APPEAL from an order of the General Term of the Supreme Court, in the first judicial district, reversing a judgment for the plaintiff, and ordering a new trial.

The complaint alleged that the defendants are stock brokers in the city of New York; that on the 27th of April, 1865, as such brokers, they bought for the plaintiff certain shares of the Erie railroad, and certain shares of the Pittsburg and Cleveland Railroad Company, describing them, which were to be held by the defendants as his brokers, subject to his order, as to when the same should be sold; that the plaintiff then left $1,900 in the defendants' hands as margin upon the purchase of the stocks; that afterward, without the knowledge or consent of the plaintiff, and without notice to him, the defendants sold the stock and converted the same to their own use, whereby the plaintiff sustained damages to a large amount, and prayed for judgment for $5,000.

The answer denied, generally, the allegations of the complaint, alleged that it was agreed, that a margin of one-tenth of the par value of the stocks should always be kept with them, and if plaintiff should fail in keeping up the margin the defendants were at liberty to sell the stocks at the brokers board at the market price according to the custom of brokers. A decline of the value is averred, a call for more margin, a failure to supply it, a notice to plaintiff, that unless he supplied the margin, the stocks would be sold, an exhaustion of the margin, a concealment of the plaintiff, so that notice could not be given to him, and a sale of a portion of the stocks on the 27th of May, 1865, of the residue on the 7th of July, and the loss to them, after applying the margin, of $450, for which the defendants had brought suit. On the trial, the plaintiff gave evidence to prove his case as alleged in the complaint.

It was proved, that the defendants were employed by the plaintiff to buy the stocks in question on his account, and to carry them for him, he paying and keeping with them a margin of ten per cent; also, a failure to keep good the margin, a sale without notice, and the amount of the deficiency.

The defendants gave evidence tending to establish the averments in their answer; also that on the 11th of May, by letter, they required of the plaintiff $1,000 additional margin, which was not paid; also on the 27th of May, in the same manner, they required a deposit of $2,000 or they would sell the stocks; that they made the sales of Erie on the 30th of May, and of the Pittsburg on the 7th of July, and a notice of such sales to the plaintiff on the 25th of July.

On the 26th of July the plaintiff repudiated these sales, and required a sale and accounting of that date, the stocks having in the meanwhile advanced in price.

The defendants offered to prove a custom of the board of brokers authorizing brokers to sell out the stocks of their customers on the exhaustion of the margin, which was rejected, and the defendants excepted. It was proved that the plaintiff was familiar with the customs of brokers in the city of New York. No notice was given to the plaintiff of the time and place of the sale of the stocks.

The judge submitted the questions of fact to the jury. As a legal proposition, he held and decided, that in the absence of a special agreement to authorize it, no sale of the stock could be made by the defendants, except upon notice given to the plaintiff, of the time and place when such sale would take place, to which ruling the defendants excepted. The judge also held and decided, that if entitled to recover, the rule of damages was the highest market value of the stock between the date of the conversion and the trial, to which the defendants excepted. The jury found for the plaintiff, $4,850.

An appeal was taken to the General Term of the first district, where the judgment was reversed and a new trial ordered. The plaintiff now appeals to this court.

*James Emott*, upon the point that even an agent, who had purchased, on an agreement by his principal to pay on delivery, could not sell without notice, cited *Merwin* v. *Hamilton* (6 Duer, 244); *Mallony* v. *Lord* (29 Barb., 454); *Pollen* v. *Lefroy* (30 N. Y., 549). Even a mere unpaid vendor can

only exercise the rights of a pawnee; he cannot rescind the contract where the thing is in *esse*, and is specifically sold. (*Ashton* v. *Green*, 3 Campb., 426; *Oakley* v. *Oakley*, 16 Q. B., 941; *Griffith* v. *Perry*, 1 E. & E., 680; Blackburn on Sales, 325; Benjamin on Sales, 594.)

But the defendants were pledgees of the stock. (*Wilson* v. *Little*, 2 Comst., 443; *Horton* v. *Morgan*, 19 N. Y., 170; Story Bailm., § 297; *Nourse* v. *Prime*, 4 J. C. R., 49; 7 id., 69; *Horton* v. *Morgan*, 19 N. Y., 170.) And as pledgees they had no right to sell, without demand of repayment of loan, specifying the time when money must be paid or stock sold, and personal notice of the time and place of sale. (*Stearns* v. *Marsh*, 4 Den., 227; *Lewis* v. *Graham*, 4 Abb. 106; *Wilson* v. *Little, supra;* *Costello* v. *Bank*, 1 L. O., 25; *Brown* v. *Ward*, 3 Duer, 660; Stor. Eq. Jur., § 1008; 2 Kent, 582; *Wheeler* v. *Newbould*, 16 N. Y., 396.)

The evidence, of a contrary usage in Wall street, was properly excluded. (*Allen* v. *Dykers*, 7 Hill, 497; *Merhants'* *Bank* v. *Woodruff*, 6 Hill, 174; S. C., 25 Wend., 674; *Bowen* v. *Newell*, 4 Seld., 191; *Wheeler* v. *Newbould*, 16 N. Y., 392; *Higgins* v. *Moore*, 34 N. Y., 322.)

Upon the general question of the liability of defendants, and the necessity of notice of sale, he cited *Brass* v. *Worth* (40 Barb., 648); *Clarke* v. *Meigs* (22 How. Pr. R., 340).

The plaintiff was entitled, as damages, to the highest value of the property, at any time he may select within a reasonable period, and before the trial, provided he sues within a reasonable time. (*Romaine* v. *Van Allen*, 26 N. Y., 309; *Scott* v. *Rogers*, 31 N. Y., 295; *Bent* v. *Dutcher*, 34 N. Y., 493.)

*William M. Evarts*, for respondents (*F. F. Marbury and H. S. Bennett* with him), cited *Horton* v. *Morgan* (19 N. Y., 170); *Whitehouse* v. *Moore* (13 Abb., 142); *Dalton* v. *Daniels* (2 Hilton, 472); 2 Parsons on Contr., 49; *Morgan* v. *Mason* (4 E. D. Smith, 636); *Hawks* v. *Drake* (49 Barb., 186); *Milliken* v. *Dehon* (27 N. Y., 364); *Sterling* v. *Jaudon* (48 Barb., 459); *Merwin* v. *Hamilton* (6 Duer, 244); *Gihon* v.

*Stanton* (5 Seld., 481–2); *Hunt* v. *Rousmaniere* (8 Wheat., 174); *Parker* v. *Brancker* (22 Pick., 40); *Brown* v. *McGrann* (14 Peters, 479); *Blackman* v. *Thomas* (28 N. Y., 67–70); Story on Agency, 650 *n.*; 2 Kent, 839.

HUNT, Ch. J.    An analysis of the contract in question, and a separation of the powers and obligations of the parties thereto, will enable us the better to determine its character. The customer, Mr. Markham, employs the broker, Mr. Jaudon, to buy certain railroad stocks for his account, and to pay for them, and to hold them subject to his order as to the time of sale.    The customer advances ten per cent of their market value, and agrees to keep good such proportionate advance according to the fluctuations of the market.    Waiving for the moment all disputed questions, I state the following as the result of this agreement :

The broker undertakes and agrees—

1. At once to buy for the customer the stocks indicated.

2. To advance all the money required for the purchase, beyond the ten per cent furnished by the customer.

3. To carry or hold such stocks for the benefit of the customer so long as the margin of ten per cent is kept good, or until notice is given by either party that the transaction must be closed.    An appreciation in the value of the stocks is the gain of the customer, and not of the broker.

4. At all times to have in his name or under his control, ready for delivery, the shares purchased, or an equal amount of other shares of the same stock.

5. To deliver such shares to the customer when required by him, upon the receipt of the advances and commissions accruing to the broker ; or

6. To sell such shares upon the order of the customer, upon payment of the like sums to him, and account to the customer for the proceeds of such sale.

Under this contract, the customer undertakes—

1. To pay a margin of ten per cent on the current market value of the shares.

2. To keep good such margin according to the fluctuations of the market.

3. To take the shares so purchased on his order, whenever required by the broker, and to pay the difference between the percentage advanced by him and the amount paid therefor by the broker.

The position of the broker is twofold. Upon the order of the customer, he purchases the shares of stocks desired by him. This is a clear act of agency. To complete the purchase, he advances from his own funds, for the benefit of the customer, ninety per cent of the purchase money. Quite as clearly, he does not in this act as an agent, but assumes a new position. He also holds, or carries the stock for the benefit of the purchaser, until a sale is made by the order of the purchaser, or upon his own action. In thus holding or carrying, he stands also upon a different ground from that of a broker or agent, whose office is simply to buy and sell. To advance money for the purchase, and to hold and carry stocks, is not the act of a broker as such. In so doing, he enters upon a new duty, obtains other rights, and is subject to additional responsibilities.

The plaintiff insists that this relation between the parties, is first, that of principal and agent, or broker, when the shares are ordered to be purchased for the account of the customer, and were so purchased; that in advancing the money to complete the purchase, the relation of debtor and creditor is created, and that thereupon the broker becomes a pledgee of the stock for the money advanced in its purchase.

The defendants, on the other hand, insist that the relation of the parties is wholly by force of a mutual and dependent contract; that defendants' agreement to hold or carry the stock was dependent on the plaintiff furnishing them with the means to do so, and that when the plaintiff failed in that respect, the obligation to hold the stock ceased, and the right to sell it was complete. In the case of a pledge it is well settled, that upon default by the debtor, the property in the subject of the pledge, does not thereby become absolutely

vested in the creditor, but that the general property still
remains in the debtor. To cut off his claim, the creditor
may resort to judicial process, or he may sell without judicial
process, upon giving notice to redeem, and giving notice of
the time and place of sale. (*Wilson* v. *Little*, 2 Comst., 443;
2 Kent Com., 581, 582; Story on Bailments, § 287, 308, 310.)
Until one of these modes is resorted to, the right to redeem
remains. (Id.)

If the theory of the defendants is correct, the plaintiff
being himself in default in the performance of the contract
on his part, can maintain no action; and if the defendants
gave notice to fill the margin, they had the right on failure
so to fill, to sell without further notice.

A pledge is a delivery of goods by a debtor to his creditor,
to be kept till the debt is discharged; or again, it is a bail-
ment of personal property as security for some debt or
engagement. (2 Kent, 577; Story on Bail., § 286.) Ordina-
rily, all goods and chattels may be the subject of a pledge,
including money, debts, negotiable instruments, and choses
in action. (Story, § 289.) While the terms of a pledge
require, that there should be a delivery of the article, it is not
necessary that there be an actual manual delivery. It
is sufficient, if there be any of those circumstances, which in
construction of law are deemed sufficient to pass the posses-
sion of the property. Thus, goods at sea may be passed in
pledge by a transfer of muniments of title, or goods in a ware-
house by the delivery of the key. "So if the pledgee has
the thing already in possession, as by a deposit or loan,
the very contract transfers to him by operation of law, a vir-
tual possession thereof, as a pledge, the moment the contract
is completed." (Story Bail., § 297, and Auth., *supra*.) Pos-
session may also be temporarily parted with, as between
pledger and pledgee, without destroying this relation, as
where so delivered for and with an agreement for redeliver-
ing; or when it is delivered to the owner as special bailee or
agent. (Id., § 299.)

While it is true that the dealer, in the present case, never

had actual possession of the property, which he claims to have pledged, he had it sufficiently to bring his case within the principles of the law of pledge. The substance of the first branch of the transaction is this : The plaintiff calls upon the defendants, who are brokers, to purchase for him certain shares of railroad stock, and furnishes him with $1,000 for that purpose, agreeing to pay interest on advances he shall make in the purchase, and commissions. The defendants make the purchase, having themselves advanced ninety per cent of the purchase money. They bring to the plaintiff the certificates of the stock thus purchased by him and for him, and deliver them to him as the owner thereof. He thereupon hands them back to the defendants, to hold as security for their advance on the purchase, with interest and commissions. If these precise forms had been observed, no one would deny that the redelivery of the certificates would have constituted a strict, formal pledge. In my opinion, the transaction, as it took place, amounted to the same thing. To have delivered the certificates to the plaintiff, and that the plaintiff should then have returned them to the defendants, to be held by them as security for the advance in their purchase, would leave the parties in precisely the same situation as if the defendants had retained them for that purpose ; the form of a delivery to the plaintiff, and a redelivery by him to the defendants, being waived by agreement of the parties. It comes fully within the principle I have already quoted from Story on Bailments, that where the pledgee has the thing in his possession, the contract of pledge operates as a delivery, the moment the contract is completed. (Story Bail., § 297.) The certificates are appropriated as security for an engagement, to wit, the payment of the advance, with interest and commissions. The possession and the delivery are complete, in the abbreviated manner I have described. The right of redemption, in other words, the ultimate ownership of the property in the plaintiff was clearly provided for, and was the prominent idea in his mind. There is no evidence here, that the plaintiff necessarily intended a sale of the stock

purchased.  He bought it for the purpose of making money. If he could make more money by holding it permanently than by selling, no doubt he would continue to hold.  But I do not find that the intention to have or to suffer a sale, or the reverse, forms an element in the definition of a pledge.  Nor do I see how the fluctuating value of the property can be invoked to determine the character of the transaction.  It cannot be doubted, upon the authorities cited, that shares of stock in an incorporated company, however unsubstantial may be its character, or however fluctuating their value, may form the subject of a pledge equally with a cargo of wheat, a vessel, or any other specific article.  In my judgment, the contract between the parties to this action, was in spirit and in effect, if not technically and in form, a contract of pledge.  To authorize the defendants to sell the stock purchased, they were bound first to call upon the plaintiff to make good his margin; and, failing in that, he was entitled, secondly, to notice of the time and place where the stock would be sold; which time and place, thirdly, must be reasonable.  (See auth., *supra.*)

The conclusion at which I have arrived is sustained by *Brass* v. *Worth* (40 Barb., 648); *Clarke* v. *Meigs* (22 How. Pr. Rep., 340), and by three unreported cases in the Supreme Court.  It is in hostility to *Hanks* v. *Drake* (49 Barb., 186); *Sterling* v. *Jaudon* (48 Barb., 459); and if I am correct, these cases must be deemed to be overruled.  No case has heretofore been presented in this court, in which the principle is involved.  *Milliken* v. *Dehon* (27 N. Y. R., 364), was decided upon the ground, that by the express terms of the contract, the broker was authorized to sell without notice, upon the customer's default.  In *Horton* v. *Morgan* (19 N. Y. R., 170), it was decided, that on a purchase, like the present, it was proper for the broker to take the title to the shares, in his own name, and that he was not bound to keep the same identical shares for the purchaser; but that his duty was performed by keeping a sufficient number of shares in his own name, or under his control, ready to respond to the call of the customer.

Nothing further was decided in either of these cases. *Wilson* v. *Little* (2 Comst., *supra*), was the case of a formal pledge, and therefore not an authority in the present case.

The argument of necessity is pressed. It is said that the stocks, which are the subjects of speculation, are fluctuating and uncertain in their character; that to save the broker from loss, prompt action is necessary, and that there is no time for notice to the dealer. It is said, in the same connection, that as the broker can make nothing by the rise of the stock, his advantage being limited to his regular interest and commissions, that it is reasonable, and must have been the understanding, that he should have the power to protect himself against loss by an immediate sale, without notice. I cannot assent to this argument. If there is such necessity, the broker must secure himself by a special contract, giving him the *right to sell without notice.* This, Mr. Jaudon insists, was the case in the present instance; but the jury have found the fact to be otherwise. The supposed necessity would be the same, if the stocks had not been purchased by the broker at all, but had been delivered to him as a formal technical pledge; and yet, the appellant's counsel does not claim, that in that event there could have been a sale, without notice to the dealer, of the time and place at which the sale would be had.

Neither do I perceive the analogy, in the position of the defendants, to claims against consignees or factors, whose duty is to sell and remit. No goods are consigned to them; none are placed with them for sale. The shares had been purchased and left in the defendants' hands, not to sell, but to hold. The time for sale, in the judgment of the plaintiff, had not arrived, until long after the defendants had parted with the property. They were never employed or authorized to sell.

Neither was the transaction an executory contract of sale, in which the law of vendor and vendee, would apply to the parties. The plaintiff bought no shares of the defendants. The defendants sold nothing to the plaintiff. Both parties understood the fact to be the reverse of this, viz., that the

shares had been purchased from some third person, the defendants having paid to that person their market value, with ten per cent of the plaintiff's money, and with ninety per cent of his own money.

In the view of the contract which I have taken, the default of the plaintiff in not responding to the demand for further margin/ assuming the same to have been sufficiently made), did not terminate his interest in the shares. He remained the general owner entitled to redeem, or to have the shares or their value delivered to him on performance of the original contract.

On the trial, the defendants offered to prove the existence of a custom in the city of New York, between brokers and their customer's, by which brokers have the right to sell out the customers stock on the exhaustion of the margin. This was an offer, not to explain the meaning of particular terms, or to prove attending circumstances to enable the court to construe the agreement, but to change the rights of the parties to a contract. / By the law, as I have interpreted it, the customer did not lose the title to his stock by any process less than a sale upon reasonable notice, or by judicial proceedings. The broker had no right to sell without such a notice. A practice or custom to do otherwise, would have no more force than a custom to protest notes on the first day of grace, or a custom of brokers not to purchase the shares at all, in a case like the present, but to content themselves with a memorandum or entry in their books, of the contract made with their customer. Such practice in each case, would be in hostility to the terms of the contract, an attempt to change its obligation, and would be void. The proof could not, therefore, be legally given./ (*Mutual Safety Ins. Co.* v. *Hone*, 2 Coms. R., 235; *Beirne* v. *Dord*, 1 Seld., 101, 102; *Thompson* v. *Ashton*, 14 J. R., 317; *Thompson* v. *Riggs*, 5 Wallace, 663, 679.)

This is an action for the conversion of the stock, and the rule of damages was correctly laid down. (*Romaine* v. *Allen*, 26 N. Y. R., 309; *Scott* v. *Rogers*, 31 N. Y. R., 676; *Burt* v. *Dutcher*, 34 N. Y. R., 493.)

Several minor exceptions were taken upon the trial, but they are without merit.

The order granting a new trial should be reversed, and judgment for the plaintiff upon the verdict affirmed with costs.

GROVER, J. (dissenting.) The determination of this case will be facilitated by considering, first, what were the rights of the respective parties, under the contract made between them, relative to the purchase of the stocks, to be made by the defendants, and which were afterward purchased by them, pursuant to the contract. The testimony differed widely, as to what the contract was; but the verdict found by the jury, under the charge given, must be assumed as settling that fact, so far as the appeal from the judgment is concerned. The appeal from the order of the Special Term, denying a new trial, which was heard by the General Term, at the same time, with the appeal from the judgment, presented another question; that was, whether the verdict was sustained by the evidence. The contract, as found by the jury, was that the defendant was to purchase such stocks as were ordered by the plaintiff, and carry the same for him; the plaintiff to place in the defendants' hands ten per cent of the market price of the stocks ordered to be purchased, as a margin, and to keep such margin good. That is, to keep such a sum of money, at all times, in the hands of the defendants, as would, together with the present market value of the stocks, exceed by ten per cent the price paid by the defendants therefor. It is conceded, that the defendants were, during the time the stocks were carried, under the contract to hold the title and retain the contract thereof. Upon the part of the plaintiff, it is claimed that, by the true construction of this contract, the defendants became the agents of the plaintiff for the purchase of the stocks; that upon the completion of the purchase, under the contract, the title became vested in the plaintiff, who became the debtor of the defendants for the price paid for the stocks, less the ten per cent advanced by the plaintiff; and that the title, held by the

defendants, was that of mere pledgees, to secure to them repayment of the plaintiff's indebtedness; and that any sale of the stocks, made by the defendants, without having given to the plaintiff such notice of the time and place thereof, as is required to be given by pledgees, is a conversion, and this irrespective of whether the plaintiff had performed his contract, by keeping good his margin, or not. Upon this construction, the plaintiff recovered at the trial. In determining, whether such are the legal rights of the parties, it will afford some aid to ascertain the object of the parties, in entering into the contract. That of the plaintiff, it clearly appears, was not to invest his money in the purchase of stocks to hold for the dividends thereon, but to acquire the chance of gain by a sale made when the value had risen in the market. For this purpose he was willing and agreed to keep the defendants indemnified from all liability to loss upon the stocks, by keeping in their hands, at all times, ten per cent more than they had paid for the stocks, over and above their present market value. The only benefit secured to the defendants from the transaction was their commission upon the purchase and sale of the stocks. The contract makes no provision for a transfer of the stocks by the defendants to the plaintiff, at any time or upon any terms, for the obvious reason that no such transfer was ever contemplated by the parties. The plaintiff, notwithstanding, probably had the right, under the contract, to require such transfer upon payment to the defendants of the amount paid by them for the stocks, together with interest and commissions; not for the reason that he was either the legal or equitable owner, or that he ever had any title to or interest therein prior to the purchase by and transfer to the defendants, but upon the ground, that as the whole risk was upon the plaintiff, and no benefit secured to the defendants under the contract except their commissions, the fair construction of the contract would give to the plaintiff the right to control the stocks, when all the benefits secured to the defendants by the contract, were realized by them. The construction put upon the contract by the judge

upon trial, is sought to be sustained by the language of the contract; that is, that the defendants were to purchase such stocks as the plaintiff directed, and carry the same for him. It is claimed that this shows that the parties intended, that when the stocks were purchased, the title as pledgor should vest in the plaintiff, and that the interest of the defendants could only be that of pledgees. This construction places the defendants entirely at the mercy of the plaintiff, as to whether he performs his contract in respect to the margin. The careful provisions made by the defendants to protect themselves from loss, by keeping in their own hands, at all times, a sufficient indemnity, in case the plaintiff had performed his contract, shows that no credit was designed to be given to him personally. The construction put upon the contract at the trial, defeats this security of the defendants. That construction requires the defendants, although the whole margin is exhausted, to retain the stocks, though rapidly depreciating, until they can find their customer and give him a reasonable notice of the time and place of sale, to afford him an opportunity to save himself from loss by redeeming the stocks, casting the risk of loss from further depreciation, in the meantime, so far as the indemnity is concerned, upon the broker. This, instead of carrying out the intention of the parties in making the contract, entirely defeats it in this respect. That intention, manifestly, was to keep the defendants amply indemnified at all times, during the continuance of the contract, from the danger of loss by the margin and stocks in their hands. This intention was, under the construction given, defeated by the act of the plaintiff in wholly neglecting, for a long time, to make his margin good, although the ten per cent paid by him was much more than exhausted by the depreciation of the market value of the stocks. Nevertheless, it was held that the defendants, who, together with their clerks, testified that they were anxious to find the plaintiff, and were searching for him for days, while affairs were in this dilemma, and the stocks continuing to depreciate, and being unable to find him, by selling the stocks, in the usual course of sales at the

board, for their present market value, rendered themselves liable to the plaintiff as tort-feasors, for the conversion of his stocks, and that the plaintiff was entitled to recover against them as such, not the value of the stocks at the time of sale, for this would have left him in debt to the defendants, but the highest price the stocks attained between the sale and the time of trial. Such a construction working such results, defeating the clear intention of the parties, should be rejected. The terms of the contract, construed by the object of the parties entering into it, import only that the defendants should purchase the stocks and themselves hold the title, at the risk of loss to the plaintiff in case of depreciation, the chance of gain to be his, in case the price advanced during the continuance of the contract. That this contract continued obligatory upon the parties until one party terminated it by notice to the other, or was guilty of a breach thereof. That in case of breach by one, the other, as in all cases of contract, was at liberty to put an end to it and recover his damages. But it is said, that this would place it in the power of the defendants to sell the plaintiff out at any time his margin fell a dollar below the ten per cent. Exactly so. The defendants had only contracted to retain the stocks on account of the plaintiff, while he kept the margin good; and when he failed to do this, the right to require them further to retain them, not, perhaps, at his, but their risk of further loss was not given by the contract. But it may be said that the plaintiff may have had no knowledge of the depreciation of the stocks, and may not, therefore, have been aware that the contract required him to make a further deposit with the defendants. The answer to this is, that by the contract, he had agreed to keep the margin of ten per cent good. He was therefore required to do this at the peril of the contract being terminated by the other party, because of his breach and of rendering himself liable for any loss sustained by the other party therefrom. He was bound to keep himself informed of the price of the stocks from time to time, so as to enable him to perform his contract. His ignorance of the price furnishes no excuse for the non-performance of

the contract. The defendants had therefore a perfect right to sell the stocks, when, by the failure of the plaintiff to keep his margin good, their security against loss, provided by the contract, was impaired. This results from the right of one party to put an end to a contract when broken by the other. The defendants could not make themselves liable for a tortious conversion of the stocks of the plaintiff, for the reason that the plaintiff had no title to such stocks. The contract contemplated that the title should at all times remain in the defendants. In case they failed to perform the contract, the plaintiff having performed on his part, he could maintain an action, not for the conversion of the stocks, but for his damages sustained by the breach of the defendants. That the defendants, after receiving the plaintiff's margin and order to purchase stocks, omitted to make any purchase, it is clear that this would have been the remedy for the plaintiff, as in that case there could be no pretense that the defendants had converted any of the plaintiff's stocks. To hold, that if after having purchased, they violated that part of the contract to carry the stocks at the plaintiff's risk, by parting with the same, they were liable for the conversion, although the plaintiff had wholly failed to keep his margin good, or any margin, we have seen, defeats the security of the defendants against loss provided by the contract. The former construction secures to both parties all the benefits of the contract. It keeps the stocks constantly at the risk of the plaintiff, and enables the defendants to protect themselves from loss by a sale, whenever the plaintiff fails to keep the margin in their hands as agreed.

If the construction of the contract was doubtful, I think the judge erred in excluding the evidence of the usage in regard to such contracts, prevailing in Wall street, that being the only locality where they are made. This evidence was not offered for the purpose of changing the established legal rights of pledgors and pledgees by a local custom contrary to the general law, but as showing that by the understanding of the parties, no such relations were

created by the contract. The court instructed the jury that the plaintiff, if entitled to recover, was entitled to the highest price between the time of sale by the defendants and the time of trial. To this there was an exception. This direction was material, as it greatly enhanced the recovery. In this, I think there was error. I shall not discuss the cases holding that the rule of damages for the wrongful conversion of property is the highest price between the conversion and the trial. The only reason upon which such a rule can be plausibly maintained is, that the defendant, by wrongfully depriving the owner of his property, has rendered him unable to avail himself of its advance in the market, as he might have done if not so deprived; and that, as it was possible the owner would have realized the highest intermediate price therefor, properly to indemnify him required that the wrong-doer should pay such price. This reason has no sort of application to the present case. Here the plaintiff had not paid for the stocks. He retained ninety per cent of the purchase price in his pocket. The sum so retained, in consequence of the depreciation, would have enabled him to have gone into the market and purchased an equal amount of the same stock. If he wished to risk the future fluctuation of the market, he should have done this. There is no such weight of authority in this State as to require this court to hold that the plaintiff could retain his money, incur no risk of loss from future depreciation, and enjoy all the chance of gain from a rise in the market, the defendants, in the meantime, exposed to all the chance of loss without any possibility of gain. A doctrine so entirely contrary to justice and reason should never be sanctioned, unless sustained by such numerous judicial decisions as imperatively to require the court, while disapproving the rule, to apply the maxim of *stare decisis.* As above remarked, there is no such weight of authority in this State. I am aware of but a few cases applying such a rule. The soundness of the rule has even been questioned by some of the ablest jurists, when applied to a case where the plaintiff was the absolute owner; much more where, as in the

present case, to give him such title he, was bound to pay the defendants a sum sufficient to enable him to purchase the like stocks in the market. But as I think the Supreme Court were clearly right in reversing the judgment and ordering a new trial, upon the erroneous construction of the contract, at circuit, I shall not further discuss the point under consideration, nor the question whether the verdict should not have been set aside as against evidence. The order appealed from should be affirmed, and judgment final given against the plaintiff, upon the stipulation.

WOODRUFF, J. (dissenting.) On the trial of this action, the case was submitted to the jury upon the distinct assumption that, as matter of law, the transaction between the plaintiff and defendants constituted between them the relation of pledgor and pledgees, the defendants holding the stock in question, as the plaintiff's property, as security for their advances. And as a consequence of this theory, their sale of the stock without notice to the plaintiff of the time and place of sale, was held a tortious conversion of the plaintiff's property, entitling him to recover the highest value of the stock after such sale. Although the instructions to the jury contained observations upon other points, the substance of the charge was equivalent to a peremptory instruction to find for the plaintiff the full amount claimed (viz., such highest price), since there was no pretense or claim that the defendants gave the plaintiff any such notice.

On the trial, the defendants had offered evidence of an old and well established custom, which authorized persons standing in the relation of the defendants to the plaintiff, to sell out the stocks on the exhaustion of the marginal security, and also to prove that the contract, as testified by the defendant to have been made between the plaintiff and the defendants, is the usual and customary one between brokers and their customers. Such evidence was rejected.

The first, and, doubtless, the most important questions in the case are, whether the court can, upon the proofs, declare

the precise nature and legal effect of the contract between these parties; and if so, was it a contract creating the relation of pledgor and pledgee?

Taking the plaintiff's own account of the transaction. He "ordered the stock purchased" by the defendants; "they were to carry it until he felt disposed to sell it;" "the stock was bought in the usual way, on a margin, put up in their hands for the purpose of carrying the stock;" "they were to furnish the money it takes to buy the stock."

It is entirely obvious that this statement furnishes a very imperfect account of the transaction, and small means of ascertaining its legal effect.

What is a purchase in the usual way on a margin? Without proof of the usages of the business in which the parties are engaged, how shall it be known?

What is "carrying stock" in its connection with such a transaction? Is the word "carry" synonymous with keep or hold; without proof of the usages of that business, who shall say?

Does an agreement to carry stock for another until he is disposed to sell it, import what its terms seem to indicate, an unqualified obligation to make the advance for the purchase of the stock, and continue such advance for years, or for a lifetime, without any right in the purchaser to close the transaction and receive back his money?

What, according to the understanding and intent of the parties, is the real contract indicated by the use of these technical terms?

In my judgment, that mutual understanding and intent is to be gathered from the usages and customs well known and established in the business.

For illustration of the use of such technical expressions, in the terms of which very large and important contracts are made, and yet which are quite unintelligible to the ordinary mind, and indeed to all, except those who are familiar with those usages and customs, and the peculiar meaning, by such usage and custom, those terms acquire,

another example may be readily selected from the transactions of dealers in stocks on speculation, viz.: A, for $500 sells to B a "part" of 600 shares of a specified stock at ninety per cent for sixty days. Will the court undertake to say what that means? Can they judicially expound that contract and declare what was the understanding and intent of the parties, and then what was its legal effect? I think not.

I find the like difficulty in the interpretation and legal effect of an agreement to buy stock on a margin in the usual way, and to carry the same on such margin. Usage and custom is not admissible to control the settled legal force and effect of a contract that is not ambiguous, nor couched in terms of technical, doubtful or unsettled meaning. But usage and custom gives meaning to terms that to one, who is ignorant of the usage, are wholly novel or even unintelligible. It is quite certain that a short phrase of few words, given as a direction to the broker, may have to him, and may be intended to have to him, a meaning so comprehensive as to require a a page to write it out in detail.

In such case, evidence of usage and custom is received, not for the purpose of varying and altering a contract, or overriding rules of law prescribing its effect, but for the purpose of ascertaining and settling what the contract was; what, in point of fact, was the mutual understanding and intent of the parties.

Again, the defendant testified to many details embraced in the arrangement with the plaintiff, in which he was contradicted by the plaintiff; as that the plaintiff was to see to it, that his marginal security was kept good, by which I understand to be meant, so that the market value of the stock, with the margin, should always exceed the cost of the stock by at least ten per cent of the par value. That if the plaintiff suffered the defendants' security to be below that amount (by reason of a fall in the market), the defendants were at liberty to sell the stock at the broker's board immediately, without notice, and some other details.

The judge, in his charge, submitted to the jury the ques-

tion, whether such an arrangement as the defendant had testi-
fied to was probable, as a test of the credibility of his testi-
mony, and yet he rejected evidence that just such a contract
as the defendant had testified to, was the usual and customary
one between brokers and their customers.

If a witness testifies to a transaction which is unusual and
extraordinary, one which is at variance with the experience
and habits of daily life, it is undoubtedly a ground of suspi-
cion of his accuracy. And on the other hand, if his testimony
accords with the general observation and experience of man-
kind in like circumstances, no jury will hesitate in their
judgment of its probable truth.

Now, here, if the transaction described by the witness was
in precise conformity to transactions made daily and hourly,
to immense amounts in the business of stock dealing, the
defendants, when pressed by the test of credibility presented
by the judge to the jury, were entitled to the benefit of that
fact.

On the main question, viz., whether an agreement by a
stock dealer to furnish the means, buy, carry and sell stock
for the account of a customer or to profit and loss, creates
between them the relation of pawnor and pawnee, I have
expressed myself at some length in *Morgan* v. *These Defend-
ants*, decided at this present term.

Apart from what I have said to the effect that what such
an agreement imports, as to the understanding and intent of
the parties, is a question of fact, to be proved by evidence,
I am clearly of opinion, that the court cannot say that it
imports that the stock purchased shall become and be the
property of the customer, and be held by the broker in
pledge or pawn, subject to the incidents of such a view of
their relations.

If constrained to give an interpretation to the arrangement,
without the aid of proof of what is the uniform and customary
understanding of those engaged in the business, I am com-
pelled to use the knowledge which observation furnishes, and
say that the construction above suggested, and which gov-

erned the present trial, seems to me to be wholly unwarranted by the nature of the transaction and the language of employment, even as detailed by the plaintiff.

In the first place, the stock dealer who is employed, though called a stock broker, does not act as broker in this transaction. It is no part of the office or duty of a broker to pay the price. It is no part of the office or right of a broker to receive the property, still less to take the title to his own name. In this transaction he acts in a peculiar business, in his own name and on his own responsibility, protected against loss by the indemnity furnished, or by the agreement to be furnished to him.

The idea of mere agency, ordinarily suggested by the name broker, does not therefore arise out of the fact that the dealers in stocks for account of others, as to profit and loss, are called stock brokers.

In the next place, the transaction, according to the intent and purpose of the employment of the broker, does not contemplate that the customer will ever receive the stock or own it. It may be, that if the broker desires to close his connection with the transaction, the customer, if he pays the cost, interest and all commissions which the broker has earned or is entitled to earn, will receive the stock, whether he may so insist or not, is a collateral question ; and if he be so entitled, it will nevertheless be true, that this is not in pursuance of the arrangement, but a departure from it, for the intent is that the stock shall be carried by the broker until directed to be sold, the customer never having the title to the stock at all.

And finally, in my opinion, the transaction is an executory agreement for a pure speculation in the rise and fall of stock, which the broker, on condition of perfect indemnity against loss, agrees to carry through in his own name and on his own means or credit, accounting to his customer for the profits, if any, and holding him responsible for the loss.

If the customer performs the conditions on his part, and the broker violates the agreement, the latter is responsible for the damages which the customer sustains thereby. And

on the other hand, if the conditions are not performed by the customer, the broker is absolved from any obligation to carry the stock longer for his benefit.

Whether the broker should give the customer notice of the fall in the market, which requires the latter to increase his marginal security, it does not seem to me necessary, in this case, to decide. That depends on the true intent and understanding of the parties, imported by the agreement, and the usages and customs in reference to which it is made. But in the case before us, the proof was given by the defendants, that by two written notices, the plaintiff was called upon to increase such security. That the office, at which they were left, was the plaintiff's place of business in the city, and where he was in the habit of receiving his letters, he himself testified. If there was any doubt on this point, it was withdrawn from the jury by the instruction that it availed nothing, since no notice of the time and place of sale by the defendants was given.

On that subject, the sale in the mode contemplated by the parties, when they entered into the transaction, the mode in which the speculation was to be carried out was the proper mode; and no such notice of the time and place of sale is consistent with the nature of the transaction. The whole was begun and carried on with reference to the customary manner in which sales in such speculations are made, and in that mode, it was intended the transaction should be closed, whenever it was closed, whether by a sale by direction of the customer, or a sale rendered lawful and proper by his default.

And once more, as to the rule of damages, if it were true that the defendants are in default. In that view, they have broken their agreement to carry the stock, so as to give the plaintiff further chance of profit. What then is his position? The title to the stock was not in him, but only such chance of profit. He had not paid for the stock. He has sustained nominal damages only, for he can buy the stock in the market, if he wishes to continue the adventure. It is not the case of one, who has bought and paid for stock to be delivered in the

future. It is not the case of one whose money is already invested in stock which another has tortiously converted. These two cases are supposed to furnish reasons why a party so situated should recover the highest value of the stock down to some indefinite reasonable time after the conversion or breach. Without commenting upon the cases which so hold, and which are very ably and sensibly criticised in the note to this subject in Sedgwick on Damages (4th edition, pp. 554, 560), where the authorities are largely collected and reviewed, it must suffice to say, that the attempt here made is to extend the rule further than ever before, and to a new class of cases.

If there be any analogy, it is rather in the case of a purchaser of personal property not paid for, who, having the money, can buy it at its market price whenever the vendor makes default.

On these various grounds, I think the judgment was properly reversed, and the order granting a new trial should be affirmed.

MURRAY, MASON, LOTT, JAMES and DANIELS, JJ., concurred with HUNT, Ch. J., for reversal.

Order reversed, and judgment for the plaintiff on the verdict.

NOTE.—All the opinions in this case have been reported, at the request of many leading members of the profession. The fact that numerous contracts of the character discussed, are daily made in the city of New York, frequently involving enormous amounts, and, also, the fact that this is the first full consideration, in the court of last resort, of the legal relations of the parties in such contracts, it was thought, rendered it proper for the reporter to comply with the request.