By the Court.-—Ingraham, J.
—This action is brought ¡ to recover the balance due plaintiffs for loss on.certain stock ; transactions conducted by- the plaintiffs, a firm of stockbrokers, for the defendant’s testator. In the examination , of the questions involved, it will not be necessary to say anything about the purchase of the Missouri, Kansas, and Texas stock, and the Atlantic and Pacific Telegraph stock. It appears that there was a profit on the transactions in i those stocks, and defendant makes no claim against the : plaintiffs in relation thereto. The loss for which plaintiffs ' claim to recover arose out of the following transactions i *329 Plaintiffs claim that in June, July, and August, 1880, they sold by the direction oí defendant’s testator, 600 shares of the stock of the Delaware, Lackawanna, and Western Railroad Company, and 400 shares of the Central Railroad Company of New Jersey ; that these sales were short sales of stock, and plaintiffs were to procure for him such stocks so sold, by borrowing the same, or in some other way to deliver to the purchasers; that the said stocks so sold were not purchased, or the transaction closed, at the time of defendant’s testator’s death, which occurred October 29, 1880 ; that letters testamentary on the estate of said Henry Rau were duly issued to the defendant December 29,1880 ; that on November 19, 1880, defendant caused to be purchased 200 shares of the stock of the Central Railroad Company for $16,225; that on January 5, 1881, plaintiffs demanded of the defendant a deposit of margins or a delivery to them of the shares of stock then short, on or before January 7, 1881, or on default thereof, plaintiff would purchase the same at the New York Stock Exchange; that defendant failed to comply with such demand, and plaintiffs purchased said stock at that time, and that there was a loss on the transaction, and a balance due plaintiffs of $9,437.98, to recover which this action was brought. The jury found a verdict for the plaintiffs. Defendant, at the close of the case, asked the court to direct a verdict for the defendant on the ground that there was no competent testimony to hold the testator liable for the short sales, which motion was denied, and defendant excepted.
The court charged the jury, that if they believed the testimony of the plaintiffs’ witnesses, that plaintiffs had made out a case and were entitled to a verdict, to which defendant excepted. Appellant claims that this was error, as there was no competent testimony of the sale of the stock ; or that it was sold by the direction of defendant’s testator. I think that the evidence introduced by plaintiffs was, if believed by the jury, sufficient to sustain a verdict for the plaintiff. It appeared by the testimony of Frankenbach, plaintiffs’ book-keeper, that he made out *330 notices for each of the sales ; that he either delivered such notices to Mr. Rau or to his (witness’s) assistant, Mr. Pox ; that Mr. Rau came to the office nearly every day-; that witness heard Mr. Rau frequently give orders to sell the stock in question ; that he had several conversations with Mr. Rau about his being short of these stocks ; that one day Mr. Rau asked him to make out a statement of the stocks he was short, and figure out how an average would come if he sold more; and that witness then stated to him he was short 600 shares of Lackawanna, and 300 shares of New Jersey Central, to which Mr. Rau made no objection : and that on or about September 28, 1880, an account was delivered to Mr. Rau by witness, that showed he was short the stocks in question, which Mr. Rau looked at. and said he supposed it was all right. Pox testified that all the notices delivered to him by Prankenbach, directed to Mr'. Rau, he delivered personally to him, specifying notices of several of the sales in question, of which he had distinct recollection. Mr. Hess testified that the stock in question was actually sold by him for Mr. Rau’s account. John Rau testified that some time before testator’s death, witness spoke to him about a statement from plaintiffs, and he said, “Never mind it now, they (plaintiffs) will not close me out,” and there was a written order for the sale of 100 shares of New Jersey Central stock. Plaintiffs were prohibited from giving evidence of any transactions with the deceased, and •such evidence uncontradicted and unexplained was sufficient to show, .at any rate, a ratification of the sales claimed to have been made for his account. The evidence -was not, as appellant seems to assume, offered to sustain an account stated, but simply to prove that the plaintiffs had made the sales in question for him as his brokers, and'an acquiescence in such sales.. It was an admission by defendant’s testator that such sales were made for him under his orders, or a ratification of such sales, and I think the trial judge was right in holding that if the jury believed such testimony, it was sufficient to establish that the stock in question had been sold for the account of the defendant’s testator, and *331 with his authority. This brings us to the main question in the case.
Mr. Rau died October 27, 1880, and the stock in quesstion was not purchased and the account closed until January 7, 1881; and defendant now claims that the plaintiffs were bound to cover the short sales at the time Mr. Rau ■died or within a reasonable period thereafter. The rights of, and the duties of the plaintiffs to, defendant’s testator, rest on the relation that existed between the parties; and the ingenious argument of defendant’s counsel, rests on the assumption that such relationship was one of principal and agent only; that the plaintiffs were simply the agents of the defendant’s testator, to sell the stock, and borrow it for Mm to make good his contract of sale until such time as he should give further directions in regard to it; and that on testators death such authority ceased. It will be necessary therefore to determine the exact relation that existed between the parties. If no other duty devolved on plaintiffs, then of course the relation between them would be one of principal and agent only, and on the death of the principal, the agency is dissolved and all authority to act for the principal is revoked. Here, however, there was a duty devolved on the plaintiffs in addition to the mere sale of the stock, and it is necessary to determine just what that duty was in order to determine what, if any, change, such a duty would make in the relations between the parties.
There have been many litigations respecting short sales of stock before the courts, and the nature of the transactions have been adjudicated upon by the court of appeals. Knowlton v. Fitch (52 N. Y. 288), was a case where the broker, after his customer’s margin had been exhausted, notified him that unless he furnished more margin they would buy in the stock. The customer failed to respond and after waiting ten days the broker closed out the transaction without further notice. The supreme court held that such purchase was unauthorized, and gave judgment against the broker. The court of appeals, in reversing the *332 judgment says, “ It is evident that to carry on such a speculation, the stock sold must be temporarily procured by the seller for delivery to the purchaser.....the plaintiff did not furnish the stock to deliver but only the margin ; the defendant furnished the stock.....until bought in, the broker remained bound to the persons from whom they had obtained the stock to return to them an equal number of shares, whatever might be the market price at the time it was demanded.” In White v. Smith (54 N. Y. 522), Judge Earle, in delivering the opinion of the 'court, says, “ I am of the opinion that when a broker agrees, for a commission to be paid tQ him and upon a deposit with him of a margin agreed on, to make a short sale for a customer, it is part of the bargain that the broker shall carry the stock for a reasonable time, for in no other way can the object of the parlies be effectual.....The broker has nob the right, unless it be specially conferred upon him, to buy in the stock, cover the sale and thus close the transaction without some notice to or direction from his customer.” He is the agent of his customer and must obev his orders both in making the sale and covering it. “If he acts without orders or against the order of his principal he commits a breach of duty and becomes liable like any agent for any loss he may thus occasion his principal.” The court further held that although the margin was reduced below the amount agreed upon, a purchase without notice to the principal was unauthorized and a breach of duty for which the broker was liable. It would appear therefore that- the relation of the broker to his customer was something different from that of a mere agent. He was bound, under his agreement with the customer, to furnish the stock for delivery to the purchaser. As Judge Earle says in White v. Smith, “It is part of the bargain thab the broker shall carry the stock for reasonable time, for in no other way can the object of the parties be effectual.” And if that duty is thrown on him by the terms of his contract or agreement, if the broker is bound to provide the stock for a reasonable time and until after notice to his principal, then the *333 converse of the positions must also be true. The principal must be liable to the broker for all loss on the transaction until the broker receives directions from the principal to close the transaction.
The case of Markham v. Jaudon (41 N. Y. 235), is cited as an authority to show that the plaintiff was simply the agent of the defendant’s testator, but it can be said here, as it was in that case, that so far as the sale was concerned plaintiff was the agent of the testator, but when the sale was made a new relation arose under the obligation of the broker to procure the stock to be delivered under the contract. It was not the relation of pledgor and pledgee, but the parties entered into a new agreement (the agency having ceased with the sale .of the stock), and that agreement could only be terminated by the order of the testator, or those having authority to represent him, or by the broker, after a reasonable time, and on notice to testator or his representatives (White v. Smith, supra). The principle relied on by the counsel for appellant, that the authority of the agent was revoked on the death of the principal, does not therefore apply. Appellant claims that the broker’s authority to borrow the stock was revoked by the death of the principal, and the acts of the broker in borrowing the stock after that time were unauthorized. That argument might apply if the stock were borrowed by the broker as the agent of the testator, but as I think, I have shown the borrowing of the stock, was by the plaintiffs, under their agreement, and not as agent for the testator.
The evidence in the case shows that the plaintiffs did not, when they borrowed the stock, assume to act as the agents of the testator, or of the estate ; but they borrowed sufficient stock to complete all the short sales that they had made for their customers. Plaintiffs, and not the estate, were liable to the parties from whom they had borrowed the stock to return an equal number of shares. It did not appear but that the testator was the owner of the stock sold, or had purchased it to be delivered at a future day. He had sold the stock, and had not delivered it.to the broker *334 to deliver. He was bound to deliver it to his broker to close the transactions when notified by the broker to so deliver;. and knowing this obligation, it cannot be assumed that he-had not in some way made arrangements to obtain the stock to make such delivery. To hold that the broker would be bound immediately on the death of his principal to purchase the stock, and close out the transaction without the direction of, or notice to, any representative of the principal, would, it seems to me, be much more liable to result in loss to principal than to hold, that on the death of the-principal the contract should continue until the appointment of a representative of the deceased, to whom notice-could be given, and from whom directions pould be received.
The fact that in this case the delay in closing out the contract resulted in a loss to the estate, should not influence the determination of the question involved, but would only show how necessary it is to have a rule established that would enable both of the parties to such an agreement to-make such arrangements as would' protect them both.
Although the question is not free from doubt, I am of the opinion that the judgment appealed from was right,, and should be affirmed, with costs.