### RICHARDSON v. SHAW et al.

(Circuit Court of Appeals, Second Circuit. June 20, 1906.)

No. 205.

BANKRUPTCY—PREFERENCES—STOCK BROKER AND CUSTOMER.

Where a broker buys stock for a customer on a margin, the title to such stock is in the customer, and not in the broker, who holds the same merely as pledgee to secure the advances made by him in the purchase. Hence the customer is not a creditor of the broker with respect to the transaction within the meaning of Bankr. Act July 1, 1898, c. 541, § 1, subd. 9, 30 Stat. 544 [U. S. Comp. St. 1901, p. 3419], and the transfer of the stock to the customer on settlement of his account cannot be considered the giving of a preference by the broker on his bankruptcy with four months thereafter.

In Error to the District Court of the United States for the Southern District of New York.

On writ of error to the Circuit Court for the Southern District of New York to review a judgment entered upon a verdict directed in favor of the defendants.

The action was brought by Henry Arnold Richardson, as trustee in bankruptcy of J. Francis Brown, to recover preferences received by the defendants in alleged violation of the provisions of the Bankruptcy Act.

Brown, the bankrupt, was a stock broker engaged in doing business at Boston, Mass.

In February, 1903, the defendants, who were copartners doing business as bankers and brokers in the city of New York, opened a speculative account with Brown for the purchase and sale of stocks on margin and deposited with him $500 for that purpose. The account was closed June 26, 1903, and during the five months of its continuance the defendants, from time to time, paid other moneys and transferred various securities, in lieu of money, as margins. The business was conducted in the usual manner, the broker buying and selling various stocks for his customers, charging them with the cost and crediting them with the proceeds of sales, the customers maintaining a margin of ten per cent. or more.

Upon the accounts rendered by Brown to the defendants was the following:

"It is understood and agreed that all securities carried in this account or deposited to secure the same may be carried in our general loans and may be

sold or bought at public or private sale, without notice, when such sale or purchase is deemed necessary by us for our protection."

In pursuance of this agreement Brown pledged on his general loans all the securities deposited with him on the defendants' account and they, through their agent, were informed of the fact. When the account was closed, on June 25th, all of these securities had been pledged by Brown who for two months prior thereto had been insolvent.

The defendants' Boston agent, who had obtained knowledge of Brown's precarious financial condition, demanded and received payment of $5,000 on the 24th of June. On the following day he insisted on a final settlement and an account was made up showing the amount of securities to the credit of the defendants to be $45,583.75, charges to the credit of Brown to be $34,919.62. The balance was $10,664.13.

This transaction is described in the complaint as follows:

"That on or about the 26th day of June, 1903, there was an accounting between the said defendants and said Brown of various dealings between them in which it was found that said defendants owed the said Brown the sum of thirty-four thousand nine hundred and nineteen dollars and sixty-two cents ($34,919.62) upon the payment of which said Brown was obligated to deliver to them certain securities or in default thereof to pay to them the amount of their then market value, to wit, the sum as they ascertained upon said accounting of forty-five thousand five hundred and eighty-three dollars and seventy-five cents ($45,583.75), and thereupon said defendants paid to said Brown said sum of thirty-four thousand nine hundred and nineteen dollars and sixty-two cents ($34,919.62), and said Brown then delivered to said defendants said securities, and the effect of such transfer will be to enable the said defendants as such creditors to obtain a greater percentage of their debt than any other creditors of said Brown of the same class."

The trial court decided that the defendants were not creditors and were entitled to their securities on paying the amount loaned thereon. The court held that the fundamental feature of the relation between the parties was that Brown, the broker, had advanced or loaned money or credit and therefore was a creditor of the defendants, holding security for the amount which they owed him and that on paying this amount the defendants were entitled to the security or their equity therein.

John Brooks Leavitt, for plaintiff in error.

Abraham Benedict (Maurice Untermyer and Arthur B. La Far, on the brief), for defendants in error.

Before WALLACE, LACOMBE, and COXE, Circuit Judges.

COXE, Circuit Judge. (after stating the facts). The bankruptcy law provides that the word "'creditor' shall include any one who owns a demand or claim provable in bankruptcy." Act July 1, 1898, c. 541, § 1, subd. 9, 30 Stat. 544 [U. S. Comp. St. 1901, p. 3419]. If, then, the defendants did not own such a claim it is manifest that they were not creditors preferred by the transactions of June 24th and 26th. In other words, the controversy turns upon the question whether or not the defendants were creditors of the bankrupt.

In 1869 the Court of Appeals of New York decided the case of Markham v. Jaudon, 41 N. Y. 235.

Chief Judge Hunt, who wrote the prevailing opinion, states the agreement between the broker and his customer, their relations and mutual obligations, to be as follows:

"The broker undertakes and agrees—

"1. At once to buy for the customer the stocks indicated.

"2. To advance all the money required for the purchase, beyond the ten per cent. furnished by the customer.

"3. To carry or hold such stocks for the benefit of the customer so long as the margin of ten per cent. is kept good, or until notice is given by either party that the transaction must be closed. An appreciation in the value of the stocks is the gain of the customer, and not of the broker.

"4. At all times to have in his name or under his control, ready for delivery, the shares purchased, or an equal amount of other shares of the same stock.

"5. To deliver such shares to the customer when required by him, upon the receipt of the advances and commissions accruing to the broker; or

"6. To sell such shares upon the order of the customer, upon payment of the like sums to him, and account to the customer for the proceeds of such sale.

"Under this contract, the customer undertakes—

"1. To pay a margin of ten per cent. on the current market value of the shares.

"2. To keep good such margin according to the fluctuations of the market.

"3. To take the shares so purchased on his order, whenever required by the broker, and to pay the difference between the percentage advanced by him and the amount paid therefor by the broker."

He then reaches the conclusion that the contract is one of pledge and repudiates the theory that the transaction creates an executory contract of sale. The customer purchased no stock of the broker; the broker sold nothing to the customer who acquired title to the stock and remained the general owner, entitled to redeem or to have the shares or their value delivered to him on paying the amount advanced by the broker with interest and commissions.

The customer could not be divested of his title to the stock except by sale upon reasonable notice or by judicial proceedings.

Two of the judges, Grover and Woodruff, dissented and presented the view for which the plaintiff here contends with the well known ability which distinguish the judgments of those eminent jurists. In their opinion such a transaction as is here shown was simply an executory agreement for speculation in the rise and fall of stocks which the broker, on condition of perfect indemnity against loss, agrees to carry through in his name, accounting to the customer for the profits and holding him responsible for the loss. The customer had no title to the stock, the contract contemplating that the stock should at all times remain in the broker. The customer's only remedy was an action for damages for breach of the contract; he had no action for conversion for the reason that he never had title to the stock. The eminence of the counsel who argued at the bar, the thorough discussion, which must have taken place in the consultation room, as evidenced by the three opinions delivered, and the fact that the principal question was for the first time presented to the court, make it apparent that the case was decided with mature deliberation and after every possible aspect of the controversy had been brought to the attention of the court.

From time to time persistent efforts have been made to induce the court to recede from or modify the doctrine of Markham v. Jaudon, but without avail. In its essential features it is the law to-day not only of New York but of a large number of other states. Massachusetts alone has consistently rejected or, rather, has failed to give the doctrine full accord.

As late as 1902, in the case of Chase v. City of Boston, 180 Mass. 458, 62 N. E. 1059, Chief Justice Holmes, now Mr. Justice Holmes, said:

"The petitioners contend that the necessary conclusion from the statement is that they held the stock as pledgees, the purchasers being the owners and pledgors, and, if this conclusion is not simply a matter of construction, that we ought to adopt the widely prevailing opinion that that is the relation of the parties in ordinary purchases upon margin, contrary to the view of the Massachusetts cases. Wood v. Hayes, 15 Gray (Mass.) 375; Covell v. Loud, 135 Mass. 41, 46 Am. Rep. 446. See Weston v. Jordan, 168 Mass. 401, 404, 47 N. E. 133.

"We see no sufficient reason for departing from what has been understood to be the law of Massachusetts ever since the time of Chief Justice Shaw. No doubt, whichever view be taken, there will be anomalies, and no doubt it is possible to read into either a sufficient number of implied understandings to make it consistent with itself. * * * The English doctrine seems to be the same as that of this commonwealth, so that we are not left quite alone in a desert of logic. Bentinck v. London Joint Stock Bank (1893) 2 Ch. 120, 140, 141."

Here, then, are the two antagonistic views; the one holding that where a broker buys stock on a margin the title is in the customer for whom he buys; the other that it is in the broker.

Theoretically there is much to be said in favor of both contentions, but we see no valid reason to reject the New York doctrine, which has now become well-nigh universal in this country, for the other.

We are inclined to think that the logic of the situation is with the prevailing doctrine. The title to stock purchased by a broker is not suspended between earth and sky; it must be somewhere. In purchasing the stock the broker acts as the agent of the customer, and, if the transaction ended at this stage, there can be little doubt that the title would be in the customer; it is his, just as any other personal property is his which he buys and pays for.

Does not the actual transaction of buying on a margin recognize the ownership of the customer? Does he lose title to the stock because it remains with the broker as security for his advances? Is it not the customer's property that is so held and would the situation, in legal effect, be different if the customer took up the stock and substituted stock or bonds actually owned by him?

As was said by the court in the Massachusetts Case, supra:

"Purchases on margin certainly retain some of the characteristics of ordinary single purchases by an agent, out of which they grew. The broker buys and is expected to buy stock from third persons to the amount of the order. Rothschild v. Brookman, 5 Bligh (N. S.) 165, 2 Dow & Clark, 188; Taussig v. Hart, 58 N. Y. 425. He charges his customer a commission. He credits him with dividends and charges him with assessments on stock. However the transaction is closed, the profit or loss is the customer's."

All this is inconsistent with the theory of ownership in the broker.

The New York cases are not absolutely controlling upon this court, but even if we had more doubt regarding it we should still deem it our duty to adhere to a rule which has been in force for nearly 40 years and which is understood and constantly recognized as a guide in the management of immense financial transactions. The situation is one where stability, uniformity and certainty are of supreme importance and the court should be absolutely sure of its position before vexing the financial center of the country with so serious a conflict of authority upon a question of commercial law.

We think, therefore, that the trial court was right in holding that the defendants were not creditors but debtors and when they paid what they owed they redeemed their stocks pledged with Brown.

Of course a different situation would have existed if Brown had disposed of the stock and had refused for that reason to deliver it on the defendants' demand.

It may be that such a refusal and subsequent acceptance by the defendants of other stock purchased by Brown, after his insolvency was known to them, would bring the case within the doctrine of Weston v. Jordan, 168 Mass. 401, 47 N. E. 133.

The trial judge carefully considered this authority and, we think, properly distinguished it from the case at bar.

The payment of the $5,000 was not preferential and we deem it unnecessary to add anything to what was said by the trial judge on that subject.

The judgment is affirmed with costs.

NOTE.—The following is the opinion of Holt, District Judge, on directing a verdict for defendant:

HOLT, District Judge. The question here, I think, is whether Shaw & Co. were creditors. If a person who is insolvent parts with money to a person who is not a creditor, that does not constitute a preference. It may be something else, but it is not a preference unless he pays money to a creditor. There have been different views as to the nature of the relation between a customer and a broker. I think that the different theories that have been suggested are all somewhat misleading. Some courts say the relations are those of principal and agent; others, pledgor and pledgee; others, that it is an executory contract, and that the broker is a vendor and the customer a vendee. There is considerable analogy in the case of a customer and broker to all these cases, but it is not a simple case of pledge or agency on sale, and to hold that it is is an instance of the confusion which arises from such analogies. It is like the discussion that arose when the question came up about the liability of telegraph companies for sending messages. Some ingenious court asserted that they were common carriers, and then there was great discussion whether they were or were not. Their duties and their obligations were something like those of common carriers, but the comparison led to confusion.

Now, the question here is: What is the actual relation between the customer and broker? It seems to me that the fundamental fact is that the broker advances the money, or the credit, with which to buy the stock. Of course, a man could go and buy stock on cash as a man speculates in land or any property, but by reason of the facts that these large stock exchanges are established, that securities are dealt in so largely, and that the sale of them can be made so quickly, it is comparatively safe for the broker to buy stock or sell stock for the customer on a margin, so called; that is, on security much less than the value of the property. So that arrangement is made, and a small margin is put up; but the essential point is that the broker raises for the customer the means of buying the stocks, and under the arrangement he takes the stocks and holds them as security for the money which he advances, and has the right to pledge them as security for borrowing the money. Now, although inherent in that arrangement are the features to some extent of pledge and agency, the fundamental feature and relation is, I think, that the broker has advanced or loaned money or credit, and therefore is a creditor of his customer and holds the security for it and has the right to pledge the security.

Now, originally, of course, as early as the 41st New York, it was held in Markham v. Jaudon, 41 N. Y. 235, that a broker who parted with the security was guilty of conversion. He was a simple pledgee and could not part with the security. The Court of Appeals had to modify that pretty soon, and later they had to admit that the broker had a right to pledge the securities, and it is

established now by the later cases in New York, as in Massachusetts, that the broker is bound to have within his reach and be able to produce similar stocks on call, but he is not obliged to keep the same stock at all. The result is, as stated by Judge Putnam in the case referred to yesterday of In re Swift in 7 Am. Bankr. Rep. 374, 112 Fed. 315, 50 C. C. A. 264: "There was much discussion before me whether or not this rule is peculiar to Massachusetts, but it is so only in name, and not in substance. The courts in New York use somewhat qualified language to describe the relation, but the substantial conditions are the same there as in Massachusetts."

I think that is obviously so. The fundamental relation is that the broker is a creditor holding security, and the customer is not a creditor until after he has tendered the amount due to the broker and demanded his securities. When he has done that, then he becomes a creditor if the broker does not give up the securities. That is what took place in this Wheatland Case (Weston v. Jordan). In that case Wheatland had parted with the stock, a demand had been made upon him for it, and he had failed to meet it, and therefore when later, for some reason or other, he went out into the street and bought that kind of stock with his money, and the customer who took the stocks knew that he had bought them, that they were not the stocks that he had purchased, but that he had gone out and taken his property and bought these stocks, the court held that that transaction amounted to a preference. I think that would be the case here, if Brown had parted with the securities, had admitted it, and refused to return them when demand was first made, and then on the eve of bankruptcy had gone and taken cash and bought these stocks and turned them over. If that had occurred, a different case would be presented. As it was, Shaw & Co. never made any previous demand for their stocks, and when the demand was made it was acceded to. Mr. Fletcher did not have them right in his pocket, of course. That would not be the case in any broker's office. If you go to your broker, tender the amount due, and ask for the stocks, and he says, "I will get them for you in the offices where they are pledged," and he goes and does it the next day, that, in my opinion, is substantially acceding to the demand. You could not hold a party for conversion or liable in a suit because he did not give them to you at that minute. That is what took place in this case, and I do not see therefore that Shaw & Co. ever occupied the position of creditors in the true sense. They were debtors, and, until they had paid the amounts which were due to the brokers, they continued to be debtors, and that is what is held in these Massachusetts cases. Judge Lowell says in this very opinion: "It would seem that the customer could not at once maintain an action for that violation without a proper demand." And in this case of Wheatland: "After Wheatland had parted with the control of the shares, and after repeated demand for them by Jordan and refusals by Wheatland to deliver them, Jordan had a valid ground of action against Wheatland." Judge Lowell, in commenting on that case, says: "I must take these words to imply that under a Massachusetts contract no right of action accrues to the customer until after demand." Judge Putnam says the same thing in the same case on appeal. As he puts it: "A banker does not ordinarily have on hand sufficient funds to meet the checks of all his depositors, if they should all draw simultaneously. A like rule applies to stock brokers. In one case, as well as in the other, so long as either remains solvent, he is presumed to be able to meet his contracts, and no action can be maintained against a banker by a depositor without first drawing a check or making some other demand. Nor in the case of a stock broker unless demand is made for the stock."

Therefore, leaving out of view this $5,000 item, it does not seem to me that there was anything in this case on the settlement between the parties, except that the customer tendered the amount which he owed to the broker and demanded his securities, and the transfer of the securities was nothing but the delivery of collateral. The estate received all that was due to it, all that it had any property in, namely, the amount that was due from the customer to the broker.

Now, with respect to this payment of five thousand dollars, Mr. Leavitt has argued very ingeniously that Shaw & Co. had made money in their speculations and were entitled to it and were not obliged to keep it there as margin; but the truth is, in my opinion, it was not paid as a debt. There was no debt

existing at that time. The debt was from the customer to the broker, and it was a case simply where a creditor has such large collateral, or securities so much in excess of the debt, that he was willing to increase the debt. It was an advance, in my opinion, from the broker to the customer to be ultimately settled when the account was closed with the customer. If he had not advanced the $5,000, he could have got the securities by paying $29,000, and it may be called a partial settlement, or, more properly, an advance on the general account.

I think that in this case the plaintiff makes out no case of a preference, and I shall direct a verdict for the defendant.