### J. J. QUINLAN & CO. v. HOLBROOK.

(Circuit Court of Appeals, Second Circuit. May 5, 1908.)

#### No. 199.

1. PRINCIPAL AND AGENT—STOCKBROKERS—EVIDENCE OF AGENCY.

In an action against a stock brokerage company, based on transactions between plaintiff and a so-called "correspondent" of defendant, who maintained an office at its expense, was guaranteed a stated compensation by defendant, and transmitted to it all orders taken over defendant's private wire, the evidence *held* to warrant the court in submitting to the jury the question whether, as to plaintiff, the correspondent was an agent of defendant.

2. BROKERS — TRANSACTIONS BETWEEN BROKER AND CLIENT — LIABILITY FOR BREACH OF CONTRACT.

Plaintiff had a number of transactions pending with defendant through an agency at the time such agency was closed, in each of which defendant had purchased and was holding on margin for plaintiff certain stocks. Plaintiff then ordered the stocks sold, with which order defendant did not comply. *Held*, that plaintiff was entitled to recover on the basis of the market price of the stocks when they were ordered sold, but that he could not recover on such basis as to the transactions which showed a profit, and rescind the contracts as to those showing a loss, and recover the advances made therein.

In Error to the Circuit Court of the United States for the District of Vermont.

Judgment was entered upon the verdict of a jury in favor of the defendant in error, who was the plaintiff below. In the opinion following the parties are designated as in the trial court.

Joseph Cavanaugh (Elisha May and Ernest W. Gibson, of counsel), for plaintiff in error.

Harland B. Howe and H. W. Honey, for defendant in error.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

NOYES, Circuit Judge. The cause of action stated in the complaint grew out of certain operations in stocks conducted by the plaintiff at Newport, Vt., through the instrumentality of one Brady. The operations ostensibly involved the purchase and sale of securities. Both parties assume them to have been legitimate. Not without effort we make the same assumption.

The plaintiff having conducted his operations through Brady, the question whether the relations of the defendant and Brady were those of principal and agent was the important one at the trial. The plaintiff claimed that an agency existed. The defendant contended that Brady was merely its correspondent. The trial court submitted the question of the existence of an agency to the jury. The defendant contends that this action was erroneous—that there was insufficient evidence to warrant a finding of agency either by agreement or through estoppel. But, assuming that the proof failed to show an agency agreement between Brady and the defendant, the difficulty with the defendant's contention and its entire case is that the very arrangement—that of correspondents—which it seeks to establish as having existed has been held by the Supreme Court of the United States in a recent case to constitute, with respect to third persons, the relation of principal and agent. In this case (Board of Trade v. Hammond Elevator Co., 198 U. S. 436, 25 Sup. Ct. 742, 49 L. Ed. 1111) the methods of doing business as described by the Supreme Court are almost identical with those shown in the present case. Mr. Justice Brewer said:

"The company maintains a place of business at Hammond, Ind., and had under lease from the Western Union Telegraph Company the exclusive use during business hours of certain telegraph wires running from Hammond to certain offices in different cities in Illinois. * * * In the lease of these wires, signed by defendant, the offices of these 'correspondents' are designated as offices of the defendant, and are contained upon regular printed forms prepared by the company. The cost or rental of these wires was paid to the telegraph company by the defendant. Over these wires the defendant caused to be transmitted continuous market quotations of the New York Stock Exchange to persons * * * who are called 'correspondents,' and who posted these quotations upon blackboards in their respective offices. Customers resorting to the correspondents' offices, and desiring to trade in any one of the sixty different stocks whose quotations are posted, give a verbal or written order to buy or sell certain grain or stocks, which is transmitted by the correspondent in his own name over the private wire of the correspondent running into his office from the office of the defendant at Hammond as an offer by the correspondent to buy from or sell to the defendant. Sometimes the price is mentioned by the customer, and sometimes not. In the latter case it is understood that the trade is to be at whatever the market is. When the order is given the correspondent exacts from the customer such margin as he sees fit, unless the customer already has money on deposit with the correspondent, or is of known financial responsibility. Defendant accepts these orders, when the state of the market justifies, by return message over the same wire, the contents of which are communicated by the correspondent to the customer. The individuality of each trade is preserved throughout by a number given to it by the correspondent's operator at the outset. The correspondent, upon receipt of this return message, gives the trader a memorandum showing the trade and the price to which his margin carries it, and, except in case of a losing trade where he has failed to protect himself by securing from the customer a sufficient margin, the correspondent neither participates in the loss nor the profit incurred in the trade. He derives as his compensation a fixed sum, whether the trade results in a profit to the defendant or to the customer."

In the present case the parties not only did business in substantially the same manner as in the Hammond Case, but the defendant guaranteed Brady a certain monthly compensation. Moreover, the existence of an agency was not expressly disclaimed by the defendant to customers of the office. How, then, can the conclusion reached in the

Hammond Case—where elaborate precautions were taken to avoid the appearance of an agency—be avoided here? The court, continuing the opinion in that case, said:

"The relations of the correspondent with the elevator company are in each case fixed by formal contract, to the effect that the parties shall deal as principals, and that the relations of principal and agent shall neither exist nor be held to exist. * * * The fact, however, that the relations between the defendant and its correspondents are, as between themselves, expressly disclaimed to be those of principal and agent, is not decisive of their relations so far as third parties dealing with them upon the basis of their being agents are concerned. * * * Notwithstanding these protestations and excessive precautions used to prevent the correspondent being held as agent, the method of business shows that the party really interested in the transaction is the defendant, and that the correspondents are compensated as if they were agents, and not principals. * * * The real transaction in this case is undoubtedly artfully disguised; but, notwithstanding the fact that the order is made and accepted at Hammond, and the margin is charged up at Hammond against the correspondent, and the profits or losses made there, we are of the opinion that in receiving, transmitting, and reporting orders to the customers, receiving their margins, and settling with them for the profits or losses incident to each transaction, the correspondent is really 'doing business' as the agent of the elevator company. * * *"

Upon the facts admitted by the defendant, the trial court might perhaps have charged, as a matter of law, that, with respect to persons in the plaintiff's position, an agency existed. The defendant, therefore, cannot complain that the question was submitted to the jury, nor that they found for the plaintiff in respect thereof.

The other assignments of error, in the charge of the court and in rulings upon evidence, do not require extended consideration. Assuming that errors were made, it cannot be said that the defendant was prejudiced thereby. If the rulings complained of had been the reverse of what they were, the verdict of the jury must have been the same, in view of the uncontradicted testimony concerning the relations between the defendant and Brady; and if the court in its charge failed to properly distinguish between agency in fact and agency by estoppel, or to properly caution the jury concerning Brady's declarations, the defendant was hardly prejudiced when the testimony which it offered itself was sufficient to establish an agency.

Upon the defendant's own case, a plaintiff's verdict for some amount was warranted. But it does not follow that a verdict for the amount actually rendered can be sustained. The plaintiff had eight transactions pending with the defendant in the Newport office when it closed. Six of these then showed profits at market prices, and two showed losses. The plaintiff sued for damages for breach of contract with respect to the profitable "trades," but elected to rescind the contracts covering those which were unprofitable, and sued to recover the moneys deposited as margins. This course of procedure was successful, and the verdict was rendered upon that basis. Thus the plaintiff recovered all the profits and stood none of the losses—a result so without precedent in stock speculation that it seems almost a pity to disturb it. But it was obtained by the application of erroneous legal principles and cannot be permitted to stand.

The rights and obligations growing out of the relation of broker and

customer are clearly stated in the following extract from the opinion in Markham v. Jaudon, 41 N. Y. 235, quoted with approval by the Supreme Court of the United States in Richardson v. Shaw (decided April 18, 1908) 28 Sup. Ct. 512, 52 L. Ed. ——:

"The broker undertakes and agrees: (1) At once to buy for the customer the stocks indicated. (2) To advance all the money required for the purchase beyond the 10 per cent. furnished by the customer. (3) To carry or hold such stocks for the benefit of the customer so long as the margin of 10 per cent. is kept good, or until notice is given by either party that the transaction must be closed. An appreciation in the value of the stocks is the gain of the customer and not of the broker. (4) At all times to have in his name and under his control ready for delivery the shares purchased, or an equal amount of other shares as the same stock. (5) To deliver such shares to the customer when required by him, upon the receipt of the advances and commissions accruing to the broker. (6) To sell such shares, upon the order of the customer, upon payment of the like sums to him, and account to the customer for the proceeds of such sale.

"Under this contract the customer undertakes: (1) To pay a margin of 10 per cent. on the current market value of the shares. (2) To keep good such margin according to the fluctuations of the market. (3) To take the shares so purchased on his order whenever required by the broker, and to pay the difference between the percentage advanced by him and the amount paid therefor by the broker."

Now, the plaintiff's whole case depended upon the assumption that his transactions with the defendant were legitimate and that the defendant as a broker actually bought the stocks in accordance with the memoranda furnished by its agent Brady. This assumption applied to all the transactions, for they were all of the same nature. Thus, when the Newport office closed, the plaintiff and the defendant stood in the relation of pledgor and pledgee. The defendant had the plaintiff's stocks, and the plaintiff owed the defendant a balance upon their purchase price. The defendant was bound to deliver the same or similar shares upon payment of the balance, or to sell them if so ordered by the plaintiff and account for the proceeds. As said by Mr. Justice Day in Richardson v. Shaw, supra:

"How, then, stood the parties at the time of the demand for the return of these shares of stock? They were held upon a contract which required the broker, upon demand, to turn over the shares purchased, or similar shares, to the customer upon payment of advancements, interest, and commissions."

In the present case the plaintiff demanded his stocks, and upon their nondelivery ordered them sold at market prices. As the defendant did not do so, the plaintiff had a right of action for breach of the contract to sell and account. The special counts in the complaint with respect to the six transactions undoubtedly afforded a proper basis for the recovery of the market price of the stocks ordered sold, with dividends collected by the defendant, but not paid over, less the advances made by the defendant, with interest and commissions. The verdict, so far as it stood upon this basis, was, with a deduction to be noted later, correct.

The plaintiff's rights and remedies with respect to the two transactions in question were precisely the same as in the case of the other six. The contract to purchase these shares had been executed and was incapable of rescission. Certainly the plaintiff was in no position to

rescind. The very fact that there were losses to the defendant when it closed those transactions showed that the plaintiff had failed to keep his margins good. These shares, having been purchased, belonged to the plaintiff as a pledgor. The defendant, by failing to sell them and account for their proceeds as directed, may have repudiated the obligation to make such sale and rendered itself liable in conversion, as well as for breach of contract. But the plaintiff had those rights of action only, and no right to recover the moneys originally advanced, and the amount thereof—$980—with interest from January 15, 1906, to June 15, 1907—amounting together to $1,063.30—was improperly included in the verdict.

Judgment reversed, unless the plaintiff remits $1,063.30. If such remittitur be made, it is affirmed. Costs of this court to the plaintiff in error.