UNITED NATIONAL BANK *v.* LEWIS H. TAPPAN.·

JUNE 3, 1911.

PRESENT: Dubois, C. J., Johnson, Parkhurst, and Sweetland, JJ.

(1) *Stocks. Brokers. Pledges.*

Where stocks which had been deposited by customers with a broker as margin, were by him re-hypothecated with complainant bank, as the broker in fact only exercised the right to repledge, the questions as to what were the terms of the contract between the broker and his customers and what may have been the rights thereby conferred upon the broker are immaterial to a decision as to whom the balance of the collateral and proceeds remaining after a sale by the bank of the property so pledged to it, belong.

(2) *Stocks. Brokers. Pledgor and Pledgee.*

Where a customer through a broker purchases stocks on a margin, the parties occupy the relation of pledgor and pledgee respectively of the stock purchased.

(3) *Stocks. Brokers. Pledges.· Powers.*

Even though the power of sale as well as of hypothecation is given to a broker over stock deposited with him by his customer, the mere existence of such a power does not of itself, establish a general property in the stock in the broker. Such title could be acquired or transferred only by the actual execution of the power, and where a broker while continuing to hold as pledgee property which had been pledged to him by his customers, repledged the stock with a sub-pledgee, the right of the customers to redeem their stock continued.

(4) *Pledge. Right to Surplus.*

A stockbroker re-pledged stock which had been pledged to him by his customers, with complainant bank. The claim of the bank against the broker which was collected by resorting to the collateral which the broker had pledged, was greater than the aggregate amount of the indebtedness due the broker from all the original pledgors and exceeded that aggregate indebtedness by more than the total value of the broker's own property included in the pledge.

*Held*, that the customers were entitled to the portion of the pledge remaining unsold and to the surplus proceeds of that which was sold, as against the trustee in bankruptcy of the broker, since their relation to the bank was that of sureties, at least to the extent which their individual property exceeded

in value the amount of the broker's lien upon it. The property of the broker should have been first applied and that of the sureties should have contributed *pro rata* only to the payment of the balance of the indebtedness, but as the property was not thus equitably applied, and as the value of such property of each of the parties could be ascertained, the rights of the parties should be established by subrogation.

(5)  *Exceptions.   Appeal and Error.   Report of Master.*

Exceptions to the action of a master in admitting and rejecting testimony, where the rulings of the master are merged in his findings on the main points, which are also excepted to, are not before the court as separate grounds for review.

(6)  *Stocks.   Delivery to Transfer Title.*

Gen. Laws, 1896, cap. 177, § 20 (now Gen. Laws, 1909, cap. 213, § 20) provides that the delivery of a stock certificate transferable only on the books of the corporation, on surrender of the certificate, to a *bona fide* purchaser or pledgee for value, together with a written transfer of the same or a written power of attorney to sell, assign and transfer the same, signed by the owner of the certificate, shall be a sufficient delivery to transfer the title against all parties.

*Held*, that this did not define, vary or enlarge agreements between owners of stock and others, but simply provided what should be a sufficient delivery to transfer title.   Whether a given transaction was an absolute transfer or pledge depended upon the intention and agreement of the parties.

BILL OF INTERPLEADER.   Heard on exceptions to report of master and overruled.

JOHNSON, J.   This is a bill of interpleader brought by the United National Bank of Providence to determine the rights of the several respondents to certain bonds, shares of stock and sums of money heretofore held by the complainant and now deposited in the registry of the Superior Court, the said property being the surplus of a pledge made to the complainant by the respondent Lewis H. Tappan, heretofore doing business as Lewis H. Tappan & Co., to secure the amount of an indebtedness of said Tappan to said complainant.

Tappan was engaged in business in Providence as a banker and broker.   The respondent Tillinghast is trustee in bankruptcy of the estate of Tappan (chosen since the commencement of this action).   The respondent Billinge is assignee of Henry G. Thresher, a customer of Tappan. The respondent McDonnell is assignee of Henry A. Water-

house, Charles Morris Smith, Jr., Elizabeth L. Pearce, William F. Leeder, David Bernkopf, Samuel K. Grover, Anita C. Baker and Philip Allen, all of whom were customers of Tappan. The other respondents, Edward P. Greene, Anna F. Greene, George M. Parks, Helen A. P. Merriman and James M. R. Taylor, were also customers of Tappan.

The several respondents (other than Tappan and Tillinghast) and the said assignors of McDonnell and Billinge, in the course of dealings with Tappan, had each delivered to him certain of the stocks and bonds involved in this case which, together with certain other stocks belonging to himself, Tappan repledged to the complainant to secure an indebtedness as above stated.

On June 9th, 1909, Tappan made a common law assignment to the respondent Tillinghast, and later, on the 9th day of November, 1909, was adjudged bankrupt and the respondent Tillinghast was chosen Trustee in Bankruptcy and was by decree of the Superior Court, December 3, 1909, permitted to intervene and was made a party to this suit. On June 9th, 1909, the pledge above mentioned remained unaltered in the possession of the complainant. Immediately thereafter the several respondents (other than Tappan and Tillinghast) and said assignors of McDonnell and Billinge gave notice to the complainant of their several claims to property in the pledge and demanded return of same. The respondent Tillinghast, first as assignee and later as trustee, also made claim to the property. The complainant resorted to the pledge and sold a portion thereof. After satisfying its claim, the property which is the subject matter of this action remained. By stipulation it appears that the portion of the pledge which was sold was disposed of in such manner that the amounts realized from the sale of the several parts thereof can readily be ascertained.

After the assignment by Tappan to Tillinghast and before the commencement of this action, the parties named as assignors of the respondents McDonnell and Billinge severally assigned to them their right, title and interest in and

to the stocks, bonds, etc., which they had deposited with Tappan and all claims and demands arising from or out of the disposition thereof by Tappan and the complainant.

The respondent, John A. Tillinghast, trustee in bankruptcy of said Tappan, in his answer admits substantially all the allegations of the bill, but claims to be entitled to the said cash surplus and also to the said bonds and shares of stock. He alleges that all of said customers except the respondent Henry G. Thresher customarily bought and sold stock through Tappan on margin, but, instead of or in addition to paying a deposit of cash as such margin, they deposited margin in the form of stocks and bonds under an agreement whereby it was expressly provided that Tappan should have the right to hypothecate, sell, or dispose of, without notice, such stock or bonds or interests therein, however held, whereby the right accrued to said Tappan to treat said stock and bonds in all respects as similar to deposits of the then cash value of said stock and bonds, and to hypothecate, pledge or sell the same as his own property for the purpose of procuring funds with which to carry the accounts of said customers with his correspondents, being liable, however, only to credit the accounts of such customers with the then value of such stock and bonds as margin paid on their accounts.

In respect to the respondent Henry G. Thresher, the Trustee in Bankruptcy in his answer claims that said Thresher did not deposit any of the shares of preferred or common stock of the United Wire & Supply Company, referred to in the bill of complaint, with Tappan in the same manner as the other respondents, but that all of said preferred and common stock had been purchased prior to said assignment by Tappan, in the name of Lewis H. Tappan & Co., under the orders of said Thresher, who had deposited only a portion of the purchase price thereof with said Tappan, but that title to said stock had never at any time vested in said Thresher up to the time of said assignment; so that at that time said Thresher had no title at law or in equity to said stock but only a right of

action to demand of said Tappan that he deliver to said Thresher any 119 shares of preferred, and any 71 shares of the common stock of said company upon being tendered by said Thresher the balance due on his account.

The trustee further claims in his answer "that when stock or bonds are deposited with brokers by way of margin, or when the title of stock purchased on margin is taken in the name of the broker, it is the general custom in this State, in case such use is demanded by the exigencies of the case, to make use of such deposits of stock and bonds or of such stock purchased, for the purpose of raising money with which to carry the accounts of such customers, and that such custom was well known, or from its generality must be presumed to have been well known, to said customers; that said Tappan in fact executed the orders of said customers in the purchase and sale of stock and bonds in connection with which said margins were deposited with said Tappan, and that in order to do so, and in order to carry the accounts of said customers, it became necessary for him to hypothecate or pledge, and accordingly he did in fact, for the purposes aforesaid, from time to time, hypothecate or pledge said stock and bonds with said bank as security for loans from said bank, as well he might; and that upon said application of said margins of stock and bonds or of said purchases of stock being made by Tappan under the terms of the respective deposits or purchases thereof with or by himself, all the right of said customers to receive back the identical stock or bonds received or purchased was at an end, and said Tappan was only liable to give them credit respectively for the then value of said stock and bonds. He further claims that the loan by the bank having been fully paid out of the proceeds of a portion of the stock and bonds deposited by Tappan with the bank, the surplus ought to be returned to him as Trustee in Bankruptcy of said Tappan."

The respondent, Arthur J. Billinge, Assignee of Henry G. Thresher, alleges in his answer that for a considerable time

prior to the ninth day of June, 1909, said Thresher had been doing business with said Tappan in manner following: Said Thresher being desirous of obtaining as much as possible of the capital stock of the United Wire and Supply Company employed said Tappan to purchase for him such shares of its preferred and common stock as he could obtain; that Tappan purchased from time to time various amounts of the common and preferred stock of said company and said Thresher from time to time paid said Tappan various amounts of money on account of his said purchases; that on November 2, 1907, in order further to secure said Tappan for the balance which was due him, Thresher left with him a certificate for 78 shares of common stock of the United Wire and Supply Company as collateral: that said Thresher, being an officer of said company and not wanting it known that he was buying its stock, permitted said Tappan to hold the stock which he purchased for him, in the name of said Tappan, but said Thresher says that all said stock was, when purchased, the property of said Thresher and was charged by said Tappan on his books to Thresher, and Thresher was credited on the books of Tappan with all said stock and with the dividends which from time to time were paid thereon, and that he, Thresher, was in fact the owner of all said stock and said Tappan was holding the same for his account and as Trustee for him; that this stock, including that bought on account of said Thresher, as well as that placed by said Thresher with said Tappan as collateral, was wrongfully pledged by said Tappan with the complainant bank; that he duly notified said bank that he claimed the surplus of the stock not sold and the moneys realized from the sale of the other of his said stocks in the hands of the complainant.

The other respondents in their answers claim that the various shares of stock which made up a portion of the collateral pledged with the note to the complainant were wrongfully pledged to the bank by said Tappan in fraud of the rights of the respondents, and deny that the Trustee

in Bankruptcy of said Tappan has any interest in the surplus now in the registry of the court, they claiming that the particular shares of stock and the bonds which were their property were deposited by them with said Tappan from time to time as security for certain advances which said Tappan agreed to make or represented that he had already made on account of purchases of other stock of other corporations for them; that said Tappan never made any such advances, and that in fraud of the rights of such customers he converted the stock and bonds to his own use and wrongfully pledged them with the bank, the said Tappan having at the time of said purchase no right or interest in said stock or bonds; that in the exercise of due diligence they gave notice in writing to said complainant of their ownership in said shares and demanded of it the return of their said property; that no right ever accrued to Tappan under any of the pledges made to him to convert to his own use, sell or otherwise dispose of any of the bonds or shares; that the title and right to and in all said shares and bonds at all times prior to the time when said Tappan placed the same with the complainant remained in said claimants, and that said Tappan wrongfully converted said stocks and bonds belonging to them to his own use and pledged said stocks and bonds to the complainant, he having at the time no right so to pledge the same; that the total value of said property of the respondents other than the respondents Tappan and Tillinghast, Trustee, amounted to a sum greatly in excess of the value of the stocks, bonds and money deposited in the registry of the court, and that said bonds, stocks and money belong to the several respondents mentioned in the said bill of complaint, as they may establish title thereto.

Tappan has not answered the bill.

The cause was by decree entered March 2, 1910, referred by the Superior Court to Edward C. Stiness, Esquire, Master in Chancery, to consider and determine the following questions:

"1. Assuming without prejudice to any party hereto, and solely for the purpose of this question, that Lewis H. Tappan & Co., actually executed the orders of all customers in the purchase and sale of stocks and bonds, what right, if any, legal or equitable, did the respondents, Edward P. Greene, Anna F. Greene, James M. R. Taylor, George M. Parks, Helen A. P. Merriman, Frank R. Hunter, and Henry A. Waterhouse, Charles Morris Smith, Jr., Elizabeth L. Pearce, William F. Leeder, David Bernkopf, Samuel K. Grover, Anita C. Baker and Philip S. Allen, assignors to respondent Thomas F. I. McDonnell, and Henry G. Thresher assignor to respondent Arthur J. Billinge, and Lewis H. Tappan, doing business as Lewis H. Tappan & Co., on June 9, 1909, have respectively in and to any or all the stocks and bonds enumerated in Par. 2 of the Bill of Complaint herein?

"2. Assuming without prejudice to any party hereto and solely for the purpose of this question that Lewis H. Tappan & Co. actually executed the orders of all customers in the purchase and sale of stocks and bonds, what, if any, right, title or interest has the respondent, Lewis H. Tappan, or his Trustee in Bankruptcy, respondent John A. Tillinghast, as against the other respondents herein, or their respective assignors, in and to the bonds, stocks and cash surplus, or any part thereof, remaining in the hands of said complainant after the satisfaction of the debt of Lewis H. Tappan to the complainant, as set forth in Par. 4 of said Bill (and now in the registry of this Court)?"

By stipulation this decree has been amplified and explained, as follows: "It is stipulated and agreed by all parties that the intent and meaning of the first of the questions submitted to the Master in and by the decree entered on the 2nd day of March, A. D. 1910, is such, that the same should be answered by a general finding relative to the title, rights or interests, legal or equitable, if any, of said parties (including the assignors of certain of said parties), as between said Tappan and the other parties

named therein (including the assignors of certain of said parties), respectively, in and to said stocks and bonds on the 9th day of June, A. D. 1909, and that the Master shall not be required to ascertain the exact state of the accounts between each of said parties (including the assignors of certain of said parties), and said Tappan, or to determine any question relative to contribution between said parties."

All parties agree that Frank R. Hunter, named in the bill and in the decree of reference and who has failed to file an answer, was joined in the proceedings by mistake, and that he has no interest in the questions or property before the court.

The case was heard by the Master upon oral testimony and certain stipulations, together covering the cases of all the claimants with respect to the questions referred to the Master. He decided in favor of the claims of the respondents other than Tappan, and Tillinghast, Trustee, and answered the questions referred to him as follows:

"1. That the respondent claimants as to the collateral stock and bonds deposited by them with Tappan were entitled as against said Tappan and his Trustee in Bankruptcy to all the rights of *bona fide* pledgors of said respective stocks and bonds, on the 9th day of June, 1909, and

"2. That the said Tappan and his Trustee in Bankruptcy as against the other respondent claimants have no right, title, or interest in and to the said bonds, stock and cash surplus, or any part thereof, remaining in the hands of said complainant, for the reasons heretofore set forth in this report."

To these findings and also to certain other preliminary or subsidiary findings of the master the respondent Tillinghast has excepted. (Exceptions Nos. 23 to 30, both inclusive.) He has also excepted to the action of the Master in admitting and rejecting certain testimony. (Exceptions Nos. 1 to 22, both inclusive.)

From the evidence taken before the Master it appeared

that these claimants were customers of Tappan & Co., and from time to time directed Tappan to buy for each of them stocks and bonds on margin, the said parties paying part of the price, and Tappan being expected to hold the purchases as security for the balance, and each of the claimants delivered to Tappan the stocks and bonds specifically mentioned in their answers as collateral security for their accounts, and received from Tappan receipts therefor, some of which receipts bore a printed indorsement and others of which did not. Confirmation notices were also sent out in some cases. The forms of these receipts and confirmation notices were as follows:

FORM 1.
The so-called Blank Receipt.

---

"LEWIS H. TAPPAN & CO.,                                    No. 146.
          BROKERS,
Street Floor, Room 103, Providence, R. I., Apr. 27, 1906.
          Banigan Building.
     RECEIVED of Wm. F. Leeder, Certificate No. A 1453, for 10 shares stock of United Traction & Electric Co., in name of William F. Leeder.
                              LEWIS H. TAPPAN & CO.,
                                             Per Dover."

FORM 2.
The Receipt with the so-called Printed Indorsement on the back.

---

"LEWIS H. TAPPAN & CO.,                                    No. C 1085.
          BROKERS.
Street Floor, Room 103, Providence, R. I., Jun. 3, 1909.
          Banigan Building.
     RECEIVED of H. A. Waterhouse, Esq., 3 bonds, Nos. 16,295–17,526–17,706, Bonds of Am. Tel. and Tel. Coll. Trust 415, due 1929, 1 M each, as Collateral Security and

subject to agreements and conditions on the back of this receipt.

LEWIS H. TAPPAN & CO.,

Per Dover."

On back of receipt.

---

"It is agreed that Lewis H. Tappan & Co. have the right to hypothecate, sell or dispose of, without notice, any and all stocks, bonds, commodities, securities, certificates, or interests therein, however held, or may buy the same, for delivery or to be held as security; and may receive or deliver as agents, certificates ordered to be bought or sold; and, in cases where transactions are made through other Bankers or Brokers, may delegate the same authority to them; and with the distinct understanding that both parties intend to complete all their transactions of purchase and sale by the actual receipt and delivery of certificates, and at their earliest convenience; and the customer agrees to repay all advances, charges and payments made in filling all orders for purchase and sale of the stocks, bonds, commodities, securities, certificates and interests therein and carrying the account."

FORM 3.
The Sold Notice.

---

"LEWIS H. TAPPAN & CO.,
        BROKERS,
Street Floor, Room 103, Providence, R. I., April 4–09.
            Banigan Building.

"In accordance with your instructions we have sold for your account and risk as stated below: (Subject to the following agreements and conditions)

"It is agreed that Lewis H. Tappan & Co. have the right to hypothecate, sell or dispose of, without notice, any and all stocks, bonds, commodities, securities, certificates, or

interests therein, however held, or may buy the same, for delivery or to be held as security, whenever in their judgment the same may be necessary to protect the account; and may receive or deliver as agents certificates ordered to be bought or sold; and, in cases where transactions are made through other Bankers or Brokers, may delegate the same authority to them; and with the distinct understanding that both parties intend to complete all their transactions of purchase and sale by the actual receipt and delivery of certificates, and at their earliest convenience; and the customer agrees to repay all advances, charges and payments made in filling all orders for purchase and sale of the stocks, bonds, commodities, securities, certificates and interests therein and in carrying the account.

E. & O. E.                    LEWIS H. TAPPAN & CO."

FORM 4.
The Bought Notice.

"LEWIS H. TAPPAN & CO.,
          BROKERS,
Street Floor, Room 103, Providence, R. I., April 6–09.
          Banigan Building.

"In accordance with your instructions we have bought for your account and risk as stated below:   (Subject to the following agreements and conditions)

"It is agreed that Lewis H. Tappan & Co., have the right to hypothecate, sell or dispose of, without notice, any and all stocks, bonds, commodities, securities, certificates, or interests therein, however held, or may buy the same, for delivery,  or to be held as security, whenever in their judgment the same may be necessary to protect the account;   and may receive or deliver as  agents certificates ordered to be bought or sold; and, in cases where transactions are made through other Bankers or Brokers, may delegate the same authority to them; and with the distinct understanding that both parties intend to

complete all their transactions of purchase and sale by the actual receipt and delivery of certificates, and at their earliest convenience; and the customer agrees to repay all advances, charges and payments made in filling all orders for purchase and sale of the stocks, bonds, commodities, securities, certificates and interests therein and in carrying the account.

E. & O. E.          LEWIS H. TAPPAN & CO."

The blank receipts are found in the cases of Thresher, Leeder, Allen, Pearce, Merriman, Greene, and Smith. The receipts with the printed indorsement are found in the cases of Waterhouse, Parks, Baker, Grover, Taylor, Bernkopf (first time November 7, 1908), Greene (4 dated March 8, 1909), and Smith. The confirmation notices are found in the following cases: Leeder (last one may have been later than last date he pledged stock), Waterhouse (last one may have been later than last deposit of collateral), Parks (throughout the account), Baker, Pearce, Smith, Greene, and Allen. There is no testimony in the cases of Bernkopf, Grover, Taylor and Merriman as to whether they were or were not received. Thresher did not receive them. So that in the cases of Greene and Smith we find blank receipts, receipts with the printed indorsement, and confirmation notices; while the cases of Leeder, Allen, and Pearce have blank receipts and confirmation notices; and the cases of Waterhouse, Parks, and Baker have receipts with the printed indorsement and confirmation notices.

Henry G. Thresher testified that he purchased the stock of the United Wire & Supply Co. through Tappan; some was paid for at the time; some within two or three days, and some was never fully paid for; the question of margins never entered into it; that he paid from time to time certain sums of money on account; the certificates were always taken out in the name of and left with Tappan; never signed a contract with Tappan; Tappan always sent him a bill for the price of the stock; dividends were always credited to

him; that at one time he took out 278 shares, in three certificates, one of which certificates—78 shares—he left with Tappan as collateral, November 2, 1907, for which he received an ordinary receipt; that he never knew any of this stock had been pledged as collateral by Tappan; that he was never in default as to security; that he never received from Tappan any "bought and sold notices"; that on June 9, 1909, he owed Tappan $7,971.28, and Tappan held for him 119 shares of preferred, and 71 shares of common, stock of the United Wire & Supply Co., which he believed was worth $20,000; that the suggestion of having the stock carried in the name of Tappan came from him and not from Tappan, and for personal reasons of his own. Tappan testified that he did tell Thresher in 1907 that he had pledged his stock.

The testimony of David Bernkopf showed that he had been a customer of Mr. Tappan for a considerable period and pledged with him at various times stock as collateral for his account. His account was always carried on margin, and he bought and sold various stocks in this manner through Mr. Tappan from time to time. He testified that on November 7, 1908, he deposited as further margin with Mr. Tappan the stock in suit upon which claim is made; that when he did so nothing was said, but that he received receipts in the above form. He testified to an understanding with Tappan to the effect that before ever selling or making use of any certificates so deposited, Tappan was to notify Bernkopf and give him a chance to make good his margin.

Substantially the same facts appear in the case of Anita C. Baker, Samuel K. Grover, Edward P. Greene (in part), and Anna F. Greene (in part). All were customers of Tappan; all were buying and selling stocks on margin. Mrs. Baker and Messrs. Bernkopf and Grover at the time of the making of all their deposits of securities here in question took receipts with printed endorsements, and Edward P. Greene and Anna F. Greene received such receipts when

making a portion of their deposits. The claim of a prior or contemporaneous parol contract to the same effect was also made in all of said cases.

The receipt with the printed indorsement on the back which was involved in all of these cases, was in form 2, *supra*, varied in each case according to the name of the customer and the particular stock deposited when the receipt was given.

The cases of Henry A. Waterhouse, George M. Parks, James M. R. Taylor and Charles Morris Smith, Jr. (in part—as to securities he deposited for which he took indorsed receipts), stand upon the same footing as those last considered, with the exception, that these parties make no claim of any parol contract varying the terms of the receipts.

The claims of William F. Leeder, Mrs. Philip Allen, Mrs. Elizabeth L. Pearce, Edward P. Greene (in part) and Anna F. Greene (in part) stand upon substantially the same footing. All were customers of Tappan and purchased and sold through him stocks in considerable amounts. All of them deposited stocks or bonds with Tappan in lieu of a cash margin. All of them at the time of such deposits of stocks or bonds took from him receipts therefor in the form of the so-called blank receipt, Form I, *supra*. These receipts bore no indorsement. Mr. Leeder and the other claimants testified that Mr. Tappan told them at various times that he would not make use of the stocks and bonds so deposited without giving them an opportunity to protect themselves by further payment of cash.

In the cases of Helen A. P. Merriman and Charles Morris Smith, Jr., the facts are the same as those set forth in the Leeder case, except that in these cases no evidence was introduced by the claimants of any parol agreement relative to the terms under which the deposits of collateral were made.

Helen A. P. Merriman received blank receipts upon depositing her securities, and Mr. Smith upon depositing some of his. According to the stipulation filed in the case

of Charles Morris Smith, Jr., above mentioned, in some transactions he received receipts with printed indorsements, and in others receipts without indorsements.

Mr. Tappan, called as a witness for the Trustee in Bankruptcy in the claim of David Bernkopf, testified that he never, subsequently to November 7, 1908, when Mr. Bernkopf deposited the stock with him and took the receipt, made any agreement with Bernkopf which modified any right that he, Tappan, might then have acquired; but that he might have told Bernkopf that he would not sell the stock, provided he kept his margin good; but he did not tell him he would not get a loan on it; that he might have told him at the time that he gave him the receipt that he would not sell his collateral without first giving him an opportunity to secure the account in some other way, he might have told him the same thing subsequently to that time; that he never did sell the stock, but simply pledged it.

This testimony applies also to the claim of Charles Morris Smith, Elizabeth L. Pearce, Anita C. Baker, William F. Leeder, Samuel K. Grover, Philip Allen, and Henry A. Waterhouse.

A. F. Davis, called as a witness for the Trustee in Bankruptcy, testified that he had been a banker and broker for about fourteen years; that it is customary for brokers in purchasing stock for a customer upon which he has only paid a portion of the purchase price, if it becomes necessary to raise loans for the purpose of carrying on their business, to make use of the stock that they purchase in that way, using any they have in the box, whether for that particular customer or for some other, in case they need money, by rehypothecating it; that brokers use anybody's stock for any account; they would take any stock that came handy.

Edgar M. Dexter, called as a witness in behalf of the Trustee in Bankruptcy, testified that he had been a stock investment broker for twenty years. In answer to the question as to whether there was any custom among stock brokers when it becomes necessary to raise loans for carrying on their

business, in regard to hypothecating or selling or making use of, in any way, stocks which they had purchased for customers and are carrying on margin, testified that brokers had a printed form which permitted them to do that; and that the custom or right of rehypothecating securities, to which he had testified, was based upon the clause giving that right contained in the "buy" order; that his whole testimony as to custom was based on the authority contained in this order so far as it relates both to the purchase of local stocks and of New York stocks, and also of hypothecating them. And A. F. Davis, recalled, testified that his testimony as to custom was also based upon the existence of such a contract as that to which Mr. Dexter had testified.

From the testimony, it appears that in all cases the dividends on the stocks deposited with Tappan were paid direct to the customers, or, in the case of Thresher, were credited to him; that no credit of collateral was given these claimants in any case on the ledger account, and that interest was always charged on the balance due Tappan, without regard to the collateral; that these claimants never knew that the stock was rehypothecated by Tappan; that they were never in default to him as to security, or, if called upon for margin, as was testified in one or two of the cases, always responded with additional collateral.

An examination of the accounts of the respective respondents with Tappan shows that the following had debit balances:

| | |
|---|---|
| Parks............................ | $5,532 33 |
| A. F. Greene..................... | 5,260 27 |
| E. P. Greene..................... | 8,240 41 |
| Helen P. Merriman................ | 4,951 01 |
| Thresher......................... | 7,971 28 |

The following had credit balances:

| | |
|---|---|
| Waterhouse....................... | 2,415 02 |
| McDonnell, as trustee for Mrs. Baker | 2,898 37 |

| | | |
|---|---:|---:|
| Leeder | $120 | 62 |
| Taylor | 204 | 40 |
| Grover | 955 | 81 |
| Mrs. Pearce | 14,044 | 89 |
| Bernkopf | 130 | 05 |
| Mrs. Phillip Allen | 1,666 | 56 |

Charles M. Smith, Jr., appeared to be a debtor to Tappan, but it also appears from the testimony, including the books of Tappan, that he had delivered to Tappan certain bonds as collateral in an amount considerably greater than the indebtedness, and that certain of these bonds had been repledged by Tappan, and that the remainder of said bonds had not been returned to Smith, but were disposed of by Tappan; said Smith waives the right to claim property therein and claims a credit for the amount to be allowed to him by which the indebtedness would be reduced to $33,792.47, for which Tappan held as security that portion of the bonds which had been repledged by Tappan, the same being of the value of $57,499.58.

The respondents admit that their respective securities repledged by Tappan to the bank are subject to the rights of the complainant bank as the *bona fide* sub-pledgee thereof, but contend that the balance of the collateral and proceeds deposited in the registry of the court belong to them, and that the property of Tappan included with the collateral given to the complainant should have been first applied to the payment of complainant's claim and the portion thereof not so applied belongs to the respondents by subrogation.

It is claimed by the trustee in bankruptcy that the conditions printed on the back of the receipt, Form No. 2, constituted a part of the contract between Tappan and the respondents with reference to the securities therein referred to, and that the conditions printed upon the confirmation notices also constituted a part of the contract between said parties with reference to the securities for which the blank receipts were given by Tappan, and that immediately upon

the deposit of their securities by said respondents, or at any rate immediately upon the exercise of the rights claimed to be conferred thereby, the title to said securities vested in Tappan, and the only right which remained to the claimants was to have the then cash value of their securities credited to their respective accounts. Counsel for the respondents call attention to the fact that, as appears from paragraph 15 of the answer of the Trustee in Bankruptcy, as well as from the testimony of Tappan himself, and all the other evidence in the case, whatever were the terms of the contracts between these respondents and Tappan, and whatever may have been the rights conferred by them on Tappan, the only right which he did in fact exercise was the right to repledge, and they insist that the question as to whether or not the terms and conditions embodied in the second form of receipt and in the confirmation notice constitute a part of the contract between these parties, is immaterial.

We think this contention is correct. Whatever rights Tappan may have had as to said property he exercised only the right to repledge. Tappan had the power to rehypothecate said securities to the complainant bank. A valid pledge of said securities having been made by Tappan to secure his indebtedness to the bank, and the bank having sold a portion of the property so pledged and applied the proceeds to the payment of said indebtedness, the question to be decided is, to whom does the balance of the collateral and proceeds belong?

In cases where a customer through a broker purchases stocks on a margin, there are two leading theories of the relation existing between the parties: (1) That the customer and broker occupy the relation of pledgor and pledgee, respectively, of the stock purchased; (2) That they occupy the relation of parties to an executory contract of purchase and sale. This question in this precise form has never been presented to the courts of this state.

The leading case under the first theory is that of *Markham* v. *Jaudon*, 41 N. Y. 235, where the defendants were em-

ployed by plaintiff to buy stocks on his account and to carry them for him, he paying and keeping with them a margin of ten per cent. In that case the court held that the legal relation created between the parties by the transaction was that of pledgor and pledgee, the stock purchased being the property of the person ordering its purchase and being in effect pledged to the brokers as security for the repayment of the advances made by them in the purchase. The court, Hunt, Ch. J., (p. 240) says: "The position of the broker is two fold. Upon the order of the customer, he purchases the shares of stocks desired by him. This is a clear act of agency. To complete the purchase, he advances, from his own funds, for the benefit of the customer, ninety per cent. of the purchase money. Quite as clearly, he does not in this act as agent, but assumes a new position. He also holds or carries the stock for the benefit of purchaser, until a sale is made by the order of the purchaser, or upon his own acting. In thus holding or carrying, he stands also upon a different ground from that of a broker or agent, whose office is simply to buy and sell. To advance money for the purchase, and to hold and carry stocks, is not the act of a broker as such. In so doing, he enters upon a new duty, obtains other rights, and is subject to additional responsibilities." At page 241 the court says: "While the terms of a pledge require that there should be a delivery of the article, it is not necessary that there be an actual manual delivery. It is sufficient if there be any of those circumstances, which in construction of law are deemed sufficient to pass the possession of the property. Thus, goods at sea may be passed in pledge by a transfer of muniments of title, or goods in a warehouse by the delivery of the key. So if the pledgee has the thing already in possession, as by a deposit or loan, the very contract transfers to him, by operation of law, a virtual possession thereof, as a pledge, the moment the contract is completed. (Story Bail. § 297, and Auth. supra.)" . . . "To have delivered the certificates to the plaintiff, and that the plaintiff should then

have returned them to the defendants, to be held by them as security for the advance in their purchase, would leave the parties in precisely the same situation as if the defendants had retained them for that purpose; the form of a delivery to the plaintiff, and a redelivery by him to the defendants, being waived by agreement of the parties. It comes fully within the principle I have already quoted from Story on Bailments, that where the pledgee has the thing in his possession, the contract of pledge operates as a delivery, the moment the contract is completed. (Story Bail., § 297). The certificates are appropriated as security for an engagement, to wit, the payment of the advance, with interest and commissions. The possession and the delivery are complete, in the abbreviated manner I have described. The right of redemption, in other words, the ultimate ownership of the property in the plaintiff was clearly provided for, and was the prominent idea in his mind." . . . "In my judgment, the contract between the parties to this action, was in spirit and in effect, if not technically and in form, a contract of pledge."

In *Skiff* v. *Stoddard*, 63 Conn. 198, the brokers kept an account with their customers in which they charged the purchase price of all stocks and securities ordered by them, the commission thereon, and interest on debit balances, and credited the selling price of what was ordered sold, margins paid and dividends received. The customer was required to sign an order in the following form: "Please buy (or sell) for my account and risk          shares. It is agreed that the brokers have the right to dispose of, without notice, all stocks purchased or sold on margin whenever said margin is reduced to two per cent." When the order had been executed and notice was sent to the customer advising him thereof, it was understood between the customer and brokers that the certificates should not be delivered to the customer until the price, with interest and commission, was paid; also that the broker might under certain circumstances sell the securities to protect himself from loss.

They kept an account with each customer, on which he was credited with all cash payments, including payments by way of margin, and with the proceeds of all sales, less commissions, and with dividends when paid upon stocks carried for him, and he was charged with the full price of securities carried, with the commissions and interest on such price. The brokers were required to keep in the hands of their New York correspondents, money and securities by way of margin equal to a stipulated per cent. of the par value of the securities ordered by the brokers. The certificates bought by the New York correspondents by order of the brokers were not delivered to the brokers, but were held or made use of by the New York correspondents, who might under certain circumstances sell the securities to protect themselves from loss. The New York correspondents did not keep separate the certificates purchased on any one order from others of the same kind received in executing other orders, and they used for the purpose of delivery upon the sales made by them in the course of their business, such as were most convenient for them to use without regard to any right of a customer to any particular certificate. The New York correspondents pledged these certificates received in executing the orders of the brokers, and whenever any certificates came into the possession of the brokers they pledged and made use of the same in the same manner. No particular certificate of property carried on margin was held by the broker for delivery to any particular customer. The court (p. 216) says: "The details of the transactions between the plaintiffs and Bunnell & Scranton, from their inception down to the point where the stocks and securities were purchased and procured, were precisely those which characterize stock-brokerage dealings in their commonly accepted form. Had delivery to the plaintiffs followed, no one could fail to recognize the transactions thus far as the usual ones between customer and broker. In this situation, if the plaintiffs had simply handed back to Bunnell & Scranton the stocks or securities so delivered, to be held by the latter as

security for any indebtedness from the former to the latter, whether incurred in the purchase or otherwise, until such time as that indebtedness and the interest thereon should be paid, these latter transactions would have been unmistakable ones of pledge. These two relations of customer and broker, and pledgor and pledgee, together with their nature and incidents, are well understood. Wherein does the combination in succession of these two relations fail to satisfy the conditions existing between Bunnell & Scranton and the plaintiffs? Clearly in no possible particular, unless it be either because there was no delivery, in the first instance, to the plaintiffs as buyers, and no redelivery by them to Bunnell & Scranton as pledgees; or, because Bunnell & Scranton enjoyed certain privileges with, or exercised certain rights over, the purchased property which do not belong to pledgees.

"That the omission of the superfluous acts of delivery and redelivery cannot operate to effect radical changes in the legal relation of the parties seems too apparent for argument. The law seeks substance, not forms. It never requires the performance of a needless act. The juggle of a pass from Bunnell & Scranton through their customer back to them again would have satisfied in technical detail all the requirements of the completion of a purchase and the inception of a pledge. The result was obtained by omitting this useless performance which the law regards the parties to have waived. It is a well recognized principle of law that formal delivery is not a necessary prerequisite of a pledge. 'If the pledgee has the thing already in his possession, the very contract transfers to him by operation of law a virtual possession thereof as a pledge the moment the contract is completed.' *Markham* v. *Jaudon*, 41 N. Y. 235; *Brown* v. *Warren*, 43 N. H. 430; *Providence Thread Co.* v. *Aldrich*, 12 R. I. 77; Story on Bailments, § 297." . . . .

"We are of the opinion that both reason and authority support the proposition that the relation of pledgor and pledgee existed between the plaintiffs and Bunnell & Scranton

at the time of the latter's insolvency as respects the stocks and securities which they were then carrying for the former in the execution of their orders.

"From this proposition it follows that the plaintiffs, as pledgors of the stocks and securities so carried, are entitled to redeem them. The assignment of Bunnell & Scranton does not interfere with the exercise of this right. The title to the pledged property was never in the insolvents. The plaintiffs have from the first been its general owners. The insolvent firm had only a special property in it. The assignment and appointment of the defendant as trustee in insolvency have never operated to deprive the plaintiffs of their ownership, nor to convert Bunnell & Scranton's interest into an absolute title in the trustee. The defendant trustee is not in the position of a *bona fide* purchaser for value. The creditors of the insolvents did not prior to the assignment have the right to appropriate the plaintiff's stocks and securities to the satisfaction of their claims. The transfer of the stocks into the name of Bunnell & Scranton upon the books of the several corporations did not confer such right. *Mowry* v. *Hawkins*, 57 Conn. 453.

"The trustee, in his capacity as a representative of the creditors, cannot therefore have acquired it. By the plaintiffs' exercise of their privilege of redeeming the property the creditors of the pledgees are not deprived of any right or advantage they ever enjoyed. Redemption involves payment of the plaintiffs' several indebtedness. From these payments the creditors obtain every benefit it was ever theirs to hope for."

In *Richardson* v. *Shaw*, 209 U. S. 365, Brown the bankrupt was a stockbroker transacting business in Boston. The respondents Shaw and Davidson were partners and stockbrokers transacting business in New York as John M. Shaw & Company, and as customers of Brown, they transacted business with him on speculative account for the purchase and sale of stocks on margin. By agreement between the parties it was understood and

agreed that all securities carried in the account or deposited to secure the same might be carried in Brown's general loans and might be sold or bought at public or private sale, without notice, if Brown deemed such sale or purchase necessary for his protection. On the accounts rendered by Brown the following memorandum was printed: "It is understood and agreed that all securities carried in this account or deposited to secure the same may be carried in our general loans and may be sold or bought at public or private sale, without notice, when such sale or purchase is deemed necessary by us for our protection." Until the account was closed on June 26, 1903, Shaw & Company from time to time paid to Brown various other sums of money as margins, which were credited to them. They also transferred to him various securities as margins in place of cash. They were charged with interest upon the gross amount of the purchase price, and credited with interest upon the margins they had deposited with Brown. If at any time the total amount of margins in securities or money exceeded ten per cent., they had the right to withdraw the excess. Brown was at no time left with a margin less than ten per cent. Shaw & Company kept a 'liberal margin,' at times rising to twenty-three and a half per cent. According to the agreement the securities carried in this account or deposited to secure the same might be carried in Brown's general loans, and such securities were so pledged by him, and Young, as agent of Shaw & Company, was informed of the fact. The stocks were figured at the market price every day and statements rendered to Young. The bankrupt Brown transacted much of his general business with Brown, Riley & Company, of Boston. He pledged his general securities with that company. On June 24, 1903, Young, the agent of Shaw & Company, as above stated, learned of Brown's precarious financial condition, and demanded payment of $5,000 cash from Brown's agent, Fletcher. At the time the margins already paid by Shaw & Company exceeded the agreed ten per cent., and Fletcher

returned to them $5,000 of such margins. On the following day, June 25, Young demanded a final settlement from Brown. At that time Brown was insolvent within the meaning of the bankrupt law, and had been for the two preceding months. On June 26, the liquidation of this account was effected as follows: Brown, the bankrupt, indorsed to Brown, Riley & Company a note of $5,000, made by one of his debtors, and gave them a check for $1,200, thereby increasing his margin on the general loan, and agreed that $10,664.13 should be charged against his margin and credited to Shaw & Company, and a check was given by them, through the Beacon Trust Company, to the order of Brown, Riley & Company, for $34,919.62, and the securities to the value of $45,583.75 were turned over to them. None of the certificates of stock which Brown delivered to Shaw & Company were the identical certificates which they had delivered to Brown as margin. Two certain bonds, known as the 'Shannon bonds,' had been deposited with Brown. Among the creditors (customers) of Brown on the final day of settlement there were a number of general customers upon transactions in purchase and sale of stocks by Brown as broker, similar to the transactions in the purchase and sale of stocks by Brown as broker for Shaw & Company. On July 27, 1903, Brown made an assignment, and was adjudicated a bankrupt within four months, and petitioner in this case, Henry Arnold Richardson, was elected trustee. It was conceded by plaintiff's counsel that it was the custom of the market to deliver shares from broker to customer of the same amount without regard to whether they were the identical shares received. Suit was brought to recover the $5,000 paid to Shaw & Company, June 24, 1903, which sum, it was alleged, was paid to them as excessive margin, and, it was alleged, enabled them to obtain a preference as one of the creditors of Brown. The second cause of action in the suit states that Shaw & Company are indebted to Brown's estate in the sum of $10,664.13, being the amount he transferred for their benefit, as above set forth. At the

close of the plaintiff's case he requested to go to the jury upon the issue of defendant's knowledge of Brown's insolvency. The court held that no preference was shown and directed a verdict for defendants. The judgment was affirmed. 147 Fed. Rep. 659, 665. The court adopts and approves the doctrine of *Markham* v. *Jaudon,* 41 N. Y. 235, *supra;* says that *Skiff* v. *Stoddard,* 63 Conn. 198, *supra,* leaves nothing to be added to the discussion, and further says (pp. 377, 379): "The rule thus established by the courts of the state where such transactions are the most numerous, and which has long been adopted and generally followed as a settled rule of law, should not be lightly disturbed, and an examination of the cases and the principles upon which they rest lead us to the conclusion that in no just sense can the broker be held to be the owner of the shares of stock which he purchases and carries for his customer. While we recognize that the courts of Massachusetts have reached a different conclusion and hold that the broker is the owner, carrying the shares upon a conditional contract of sale, and, while entertaining the greatest respect for the Supreme Judicial Court of that State, we cannot accept its conclusion as to the relation of broker and customer under the circumstances developed in this case. We say this, recognizing the difficulties which can be pointed out in the application of either rule.

"At the inception of the contract it is the customer who wishes to purchase stocks and he procures the broker to buy on his account. As was said by Mr. Justice Bradley speaking for the court in *Galigher* v. *Jones,* 129 U. S. 193, 198, a broker is but an agent, and is bound to follow the directions of his principal or give notice that he declines the agency.

"The dividends on the securities belong to the customer. The customer pays interest upon the purchase price and is credited with interest upon the margins deposited. He has the right at any time to withdraw his excess over ten per cent. deposited as margin with the broker. Upon settle-

ment of the account he receives the securities. In this case the broker assumed to pledge the stocks not because he was the owner thereof, but because by the terms of the contract printed upon every statement of account he obtained the right from the customer to pledge the securities upon general loans, and in like manner he secured the privilege of selling when necessary for his protection.

"The risk of the venture is entirely upon the customer. He profits if it succeeds; he loses if it fails. The broker gets out of the transaction, when closed in accordance with the understanding of the parties, his commission and interest upon the advances, and nothing else. That such was the arrangement between the parties is shown in the testimony of the broker's agent, who testified 'if these stocks carried for J. M. Shaw & Company made a profit, that profit belongs to Shaw & Company over and above what he owed us.'

"When Young, the agent of Shaw & Company, demanded the stocks, their right of ownership in them was recognized and, while pledged, they were under the control of the broker, were promptly redeemed and turned over to the customer. Consistently with the terms of the contract, as understood by both parties, the broker could not have declined to thus redeem and turn over the stock, and when adjudicated a bankrupt his trustee had no better rights, in the absence of fraud or preferential transfer, than the bankrupt himself. *Security Warehousing Co.* v. *Hand*, 206 U. S. 415, 423; *Thompson* v. *Fairbanks*, 196 U. S. 516, 526; *Humphrey* v. *Tatman*, 198 U. S. 91; *York Man'f'g Co.* v. *Cassell*, 201 U. S. 344, 352." . . . "The broker cannot be converted into an owner without a perversion of the understanding of the parties, as was pertinently observed in the very able discussion already referred to in *Skiff* v. *Stoddard*, 63 Conn. 216. 'So long as the interpretation of the contract preserves as its distinctive feature the principal proposition that the customer purchases merely the right to have delivery to him in the future, at his option, of stocks or securities at the price of the day of the agreement, and its

corollary that the customer derives no right, title or interest in the stocks or securities until final performance, the difficulties in the way of harmonizing the situation are bound to exist. The fundamental difficulty grows out of the necessary attempt in some way to transform the customer, who enjoys all the incidents and assumes all the risks of ownership, into a person who in fact has no right, title or interest, and to create out of the broker, who enjoys none of the incidents and assumes not a particle of its responsibility, a person clothed with the full title and an absolute ownership.'"

"We reach the conclusion, therefore, that although the broker may not be strictly a pledgee, as understood at common law, he is, essentially, a pledgee and not the owner of the stock, and turning it over upon demand to the customer does not create the relation of a preferred creditor within the meaning of the bankrupt law." See also *Thomas* v. *Taggart*, 209 U. S. 385; *In re Jacob Berry & Co.* 149 Fed. 176.

The second theory, that the customer and broker occupy the relation of parties to an executory contract of purchase and sale, has found support in certain Massachusetts' cases; *Wood* v. *Hayes*, 15 Gray, 375; *Covell* v. *Loud*, 135 Mass. 41; *Chase* v. *Boston*, 180 Mass. 458.

(3)    What was done by Tappan is uncontroverted. He took property which had been pledged to him by his customers, while continuing to hold the same as pledgee and with other property belonging to himself made a pledge to the complainant. The pledge to the complainant remained unaltered at the time of the assignment by Tappan and at the times of the subsequent demands for the property made upon the complainant by the several original pledgors or their assigns. Even though the power of sale as well as of hypothecation was given to Tappan, the mere existence of such power did not, of itself, establish general property in him. He may have had means or power by which he could have acquired or transferred title, but the title could be acquired

or transferred only by the actual execution of the power. Such power remaining unexecuted, the right to redeem continued. *R. I. H. T. Co.* v. *Bank*, 14 R. I. 625; 31 Cyc. 1088; *Furber* v. *Dane*, 203 Mass. 108, 116.

The textwriters have adopted the view of the cases following *Markham* v. *Jaudon*. Thus *Dos Passos*, on Stockbrokers and Stock Exchanges, p. 194,— "Where, instead of money, the client deposits stock, *etc.*, as margin, the relation of pledgor and pledgee exists." At p. 296: "Until his title is divested by sale or judicial proceedings, the pledgor's right to redeem is a continuing one, and as an incident to this right of redemption he may at any time during its continuance invoke the act of a court of equity and ask to have the amount of his debt ascertained, if uncertain." In Jones on Pledges and Collateral Securities, sec. 552, the rule is stated: "But in case of a pledge as has already been noticed the pledgor does not part with the general title, but only with possession and a special property. Upon default the debtor still retains the general title. The property is not conveyed upon a condition that the conveyance shall be void upon performance of the condition. There is no conveyance of the thing pledged, and no condition upon the breach of which the property becomes absolute in the creditor. Therefore the debtor has a legal right to redeem although he has not paid the debt secured at its maturity, or otherwise performed the conditions of his contract." And in *Furber* v. *Dane*, 203 Mass. 108, 116, the court says: "But it does not follow that after payment of the debts for which they were pledged, and while they can still be followed in specie they should go to the firm or to the firm's assignee. After all charges properly to be made against them have been satisfied, the firm's special property in them no longer exists, and they should be returned to the general owner, if their identity has been preserved." See also Colebrook on Collateral Securities, § 306.

(4)   The claim of the complainant against Tappan, which was collected by resorting to the collateral which Tappan had

pledged (and collected only in that manner), was greater than the aggregate amount of the indebtedness due Tappan from all his customers (the original pledgors), and exceeded that aggregate indebtedness by more than the total value of Tappan's own property included in the pledge.  (Stipulation).  The indebtedness of the customers having been thus paid and overpaid out of their property they are entitled to the portion of the pledge remaining unsold and to the surplus proceeds of that which was sold.  When Tappan pledged the property of himself and others to secure his indebtedness the relation of principal and surety arose, Tappan being the principal and each of the others being sureties, at least to the extent which his property exceeded in value the amount of Tappan's lien (if any), upon it. "A person pledging his property as security for the payment of the debt of another stands in the position of a surety of the debtor." Jones, Pledges and Collateral, Sec. 517 a. "A person who pledges, by mortgage or otherwise, his own property to secure the payment of the debt of another person, thereby becomes a surety, nothing more or less, and entitled to all the rights of any other surety, and upon payment, is subrogated to the benefit of any securities held by the creditor, etc." Harris' Law of Subrogation, Sec. 243.  One who pledges his property for the debt of another is entitled to subrogation.  Sheldon on Subrogation, Sec. 104. The property of the principal debtor (Tappan), included in the pledge, should have been first applied to the payment of the indebtedness.  The property belonging to the sureties, included in the pledge, should have, in equity, contributed *pro rata* only to the payment of the balance of the indebtedness.  As the property included in the pledge was not thus equitably applied to such payment and as the value of the property of each of the parties contained in the pledge is known or can be ascertained (stipulation) it follows that the rights of the several parties should be adjusted and established by subrogation.  *Hidden* v. *Bishop*, 5 R. I. 29, 31; *Shelton & Tuttle* v. *Hurd*, 7 R. I. 403, 405; *Thompson*

v. *Taylor Symonds & Co.* 12 R. I. 109; *Holland* v. *Citizens Savings Bank,* 16 R. I. 734, 736.

"Subrogation applies where one party pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter. Sheldon on Subrogation, § 1, and cases cited in note on page 2. Where a mortgage debt, for instance, is paid by one who is entitled to pay it for his own protection, but is not under any legal liability to do so, he is subrogated by operation of law, to the rights of the mortgagee, the doctrine being founded upon the principle that one who thus pays the mortgage debt is equitably entitled to the mortgage security. As said in *Keely* v. *Cassidy,* 93 Pa. St. 319: 'The general principle upon which subrogation rests is that whenever anyone pays a debt for which he is liable as security or guarantor, it is equitable that he should be substituted in place of the creditor.' It is also stated in the same case that 'the principle which governs in all cases of substitution is one of equity merely and is to be carried out in the exercise of an equitable discretion with a due regard to the legal and equitable rights of others.' In *National Bank* v. *Cushing,* 53 Vt. 321, 326, the court say: 'It is only in cases where the person paying the debt stands in the situation of a surety or is compelled to pay in order to protect his own interests, that a court of equity substitutes him in the place of the creditor as a matter of course, without any special agreement.'" *Dean* v. *Rounds,* 18 R. I. 436, 446. *Martin, Pet'r.,* 25 R. I. 1, 7. "The right of contribution arises between sureties where one has been called on to make good the principal's default, and has paid more than his share of the entire liability." Adams, Eq., Sec. 269, including foot note 1 and cases there cited. "The right of exoneration arises between surety and principal, so soon as the surety has paid any part of the debt. Immediately on making such payment, he may bring assumpsit at law against his principal for indemnity. And he may also sue the creditor in equity for an assignment of any mortgage or collateral

security for the debt, so that he may, as far as possible, be substituted in his place." Adams Eq. Sec. 269. "When securities belonging to several persons have been rehypothecated together as security for a single loan, the pledgee taking them should proceed *pari passu* in applying the securities to the satisfaction of the loan, so that each of the several owners of the securities shall bear his just proportion of the common burden. If such pledgee, without notice of the claims of the true owners, sells the securities belonging to one, and therefrom satisfies the claim for which he holds all the securities, leaving the others undisposed of, a court of equity will order the remaining securities to be disposed of, and the proceeds applied in such a manner that the burden of the loan will be borne in equitable proportions by all,"— Jones, Pledges and Collateral Securities, Sec. 512.

Brokers pledged certain stocks, etc., as security for a loan obtained for their benefit. The pledge consisted in part of property belonging to the brokers, in part of property which had been pledged to them by customers upon agreements that they might repledge and in part of property which had been pledged to them by a customer without the right to repledge. Held, that the last named customer could compel the creditor to first resort to the property of the brokers and the customers who had given the right to repledge before resorting to that which belonged to him and which the brokers had wrongfully included in the pledge. *Skiff* v. *Stoddard*, 63 Conn. 198, 231.

"He who pays a debt for which another is primarily liable, as surety, or standing in the situation of a surety, is entitled to be subrogated to all the rights of the creditor, as to any fund, lien or equity, which he may have against any other person or property, on account of such debt; and this right depends upon principles of justice and equity, and not upon contract, either express or implied." Harris' Law of Subrogation, Sec. 162. "Upon full payment a surety is subrogated to the remedies of a creditor, not only against his principal, but against others who are liable for the debt.

Subrogation does not depend on privity nor strict surety-ship. It is the mode by which equity compels the ultimate payment of a debt, by him, who in good conscience ought to pay it; and to relieve him whom none but the creditor could ask to pay it." Harris' Law of Subrogation, Sec. 163. "Where sureties are equally bound for the debt of their principal, they are equally entitled to contribution, and if one pays the debt to the creditor, whether by compulsion or not, he is subrogated to the rights of the creditor; *to his actions and securities*, but it is to be carried into effect upon the just principles of an equitable contribution, and he cannot collect the full amount paid by him from his co-sureties, because he is equally liable with them for his just proportion of the debt. But as to the principal and any securities on hand, it is different; he may demand and collect the full amount he has paid to the creditor." Harris' Law of Subrogation, Sec. 170.

The trustee in bankruptcy claims that where the bank which it is admitted rightfully sold the rehypothecated stock, has a balance in its hands, the customers whose stocks have been sold cannot trace their holdings into the cash surplus realized by the bank, and that it is payable to the trustee; that the theory of the claimants that the debt of Tappan to the bank having been paid by the sale of the securities, the cash surplus is impressed with a trust for the benefit of the claimants, is untenable, since it has been held by the Supreme Court in the case of *Crosby* v. *Miller, Vaughn & Co.*, 25 R. I. 172, that persons occupying the position of these claimants have merely contract rights and not the rights of beneficiaries under a trust. It is true that this case holds that the relation between a broker and customer is not a fiduciary one, but to say that the relation of a broker is not that of a trustee is not to say that it is not that of a pledgee, upon the facts as established in this case, and having established the relation of pledgor and pledgee, it follows that the pledgors are entitled under the authorities

as set forth above, to the application of the surplus fund as found by the Master.

To these findings and also to certain preliminary or subsidiary findings of the Master, the respondent Tillinghast has excepted. Exceptions Nos. 23 to 30, both inclusive. He has also excepted to the action of the Master in admitting and rejecting certain testimony. Exceptions Nos. 1 to 22, both inclusive.

(5)     We do not think that Exceptions Nos. 1 to 22 are before the court as separate grounds for review, the error, if any, present in such rulings being merged in the findings of the Master which are the subjects of Exceptions Nos. 29 and 30.

Exceptions 23 to 30 inclusive, are as follows:

"23.    That the report of the Master in finding that collateral was deposited with Tappan under an express agreement on his part that the same should not be rehypothecated or sold unless the account needed protection, in which case the customer would be notified and have an opportunity to put up additional collateral before the original collateral would be resorted to, is not supported by the evidence." (Report p. 60).

"24.    That the report of the Master in finding that certain claimants had oral agreements with Tappan which were not modified by any provisions of the so-called receipts with printed indorsements, or in the confirmation notices, is not supported by the evidence."   (Report pp. 62 and 63).

"25.    That the report of the Master in finding that there was no well-known, universal custom permitting a broker to hypothecate stock under certain conditions referred to in said report, is not supported by the evidence."   (Report p. 71).

"26.    That the report of the Master in finding that customers of Tappan whose rights are governed by the receipts and confirmation notices are in the position of pledgors and Mr. Tappan in the position of pledgee, is contrary to law."   (Report, p. 87).

"27. That the report of the Master in finding that General Laws of 1896, Chap. 177, Sec. 20, has no bearing upon this case, is contrary to law." (Report, pp. 89 and 90.)

"28. That the report of the Master in finding that the customers of Tappan ought to be placed in the same position as though the complainant had first applied securities originally owned by Tappan to the payment of the complainant's claim, is contrary to law." (Report, p. 98).

"29. That the report of the Master in finding that the respondent claimants to the collateral stocks and bonds deposited by them with Tappan, were entitled as against said Tappan and his Trustee in Bankruptcy to all the rights of *bona fide* pledgors of said respective stocks and bonds on the ninth day of June, 1909, is contrary to law." (Report, pp. 102 and 103).

"30. That the report of the Master in finding that the said Tappan and his trustee in bankruptcy as against the other respondent claimants have no right, title or interest in and to the said bonds, stocks and cash surplus or any part thereof remaining in the hands of said complainant, is contrary to law." (Report, p. 103).

Although the findings set out in said exceptions Nos. 23 to 28 appear in the Master's report, they are preliminary to the findings which are the subject of exceptions Nos. 29 and 30. They are not responsive to the questions referred to the Master by the decree. The only findings thus responsive are the findings which are the subject of Exceptions Nos. 29 and 30. We think the others may properly be regarded as merged in said last mentioned findings. However, if considered as exceptions, they are without merit. It being conceded that the hypothecation of the securities in this case created a valid pledge in the hands of the complainant it cannot be material to consider whether securities were deposited under an express agreement by Tappan that they should not be rehypothecated or sold unless the account needed protection; or whether there were oral

agreements with Tappan which were not modified by any provisions of the receipts with printed indorsements or confirmations; or whether there was evidence of a well-known universal custom permitting a broker to hypothecate stock under certain conditions referred to in the report, as (6) in exceptions Nos. 23, 24 and 25. The finding objected to in Exception No. 26 is clearly included in the Master's finding that the respondent claimants were entitled to all the rights of *bona fide* pledgors. The finding which is the subject of Exception No. 27, was clearly correct. Chapter 177, sec. 20, Gen. Laws, 1896, is not to be construed as defining, varying or enlarging agreements or relations which may have been entered into between owners of stock and others. It simply provides what shall be a sufficient delivery to transfer title. Whether, however, a given transaction is an absolute transfer or a pledge must depend upon the intention and agreement of the parties. The ruling which is the subject of Exception No. 28 was correct, and is sustained by all the authorities on subrogation cited *supra*.

The exceptions to the Master's Report are overruled. The Master's Report is confirmed and the cause is remanded to the Superior Court with direction to enter a decree in accordance with this opinion, and for further proceedings.

*C. M. Van Slyck, Frederick A. Jones*, for complainant.

*Lyman & McDonnell, Green, Hinckley & Allen, Frederick W. Tillinghast, Rush Sturges*, of counsel, *Comstock & Canning, Henry C. Hart, Nathan W. Littlefield, William J. Brown, Mumford, Huddy & Emerson*, for various respondents.